# CONSULTING PROJECT

## PRE-SENTENCE MEMORANDUM

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-against-

LONG HUI LIN
Docket # 20-Cr-00452-RPK-2

JUDGE RACHEL P. KOVNER

Rachel August Shanies
Assistant United States Attorney

Respectfully submitted,

Mandi Budah, MA, LCSW
Forensic Social Work Consultant

Reynaldo Cusicanqui, B.A.
Forensic Mitigation Specialist
CONSULTING PROJECT

Howard Greenberg, Esq.
139 Court Street
Brooklyn, NY 11201
DEFENSE COUNSEL

June 22, 2021

CONTENTS

INTRODUCTION…………………………………………………………………….…Pg. 3

BIOPSYCHOSOCIAL HISTORY……………....………………………………………..Pg. 5

COLLATERAL INTERVIEW WITH XIU XIANG FANG…………………………….Pg. 7

ARRIVAL IN THE UNITED STATES AND EXTREME HARDSHIPS……………….Pg. 10

COLLATERAL INTERVIEW WITH WEN WEN CHEN…………………………….Pg.12

RELATIONSHIP WITH EXTENDED FAMILY……………………………………….Pg.14

EDUCATIONAL AND EMPLOYMENT HISTORY………………………………….Pg. 15

ALCOHOL AND SUBSTANCE USE HISTORY…………………..……….……...….Pg. 16

LEGAL HISTORY…………………………………………..…………………......Pg. 17

MEDICAL AND PHYSICAL HEALTH HISTORY………………………………….Pg.17

MENTAL HEALTH HISTORY……………………………..…………………….......Pg. 17

CLINICAL ASSESSMENT……………………………….....…………………….Pg. 18

SENTENCING RECOMMENDATIONS………………………………….…...……...Pg. 24

EXHIBITS:

1. Demographic and Personal Information
   a. Birth Certificate and Translation – Long Hui Lin
   b. Mother's Divorce Judgment of Divorce-February 22, 2012
   c. Letter of Pregnancy for wife-Wen Wen Chen
   d. Doctor's letter confirming mother's medical status-Eric Zhou, M.D

2. Financial Information
   a. U.S. Individual Income Tax Return – 2019 and 2020
   b. TransUnion Credit Report

3. Letters of Support
   a. Xiu Xiang Fang – Mother
   b. Zi Liu Zhang – Mother's Boyfriend

**INTRODUCTION**

This pre-sentence memorandum has been prepared by the Consulting Project, a private mitigation and forensic social work firm that assists defense attorneys with evaluations of individual clients and cases with a view toward presenting alternative pleas and sentencing possibilities to the Court and the Unites States Attorney's Office.  This memorandum is submitted by Reynaldo Cusicanqui, BA and Mandi Budah, MA, LCSW on behalf of Long Hui Lin, at the request of his attorney, Howard Greenberg, Esq.

Mr. Cusicanqui has worked as a Forensic Mitigation Specialist and Sentencing Advocate since 1995. Due to his lengthy experience, he has knowledge of psychosocial contributors and extensive knowledge of criminal behavior derived from evaluating thousands of defendants in the state and federal court systems.  He has also gained most of his forensic experience in mitigation from being appointed as a Senior Mitigation Specialist on numerous death penalty eligible matters in the United States District Court for the Southern and Eastern Districts of New York.  I, Mandi Budah have worked as a Licensed Clinical Social Worker since 2012 and additionally possess a master's degree in Forensic Psychology, obtained in 2010.  With my knowledge of psychosocial contributors and comprehensive knowledge of criminal behavior obtained from working with the Consulting Project, I conduct evaluations, prepare Pre-pleading and Pre-sentence reports for the court, and recommend necessary sentencing alternatives on criminal matters.  It is our specialty to provide the greatest amount of psychosocial background to the decision-making parties.  This ultimately allows us to enhance the appropriate classification of a defendant that is a risk to the community or a defendant that is deserving of a just and appropriate disposition that will ultimately promote respect for the law and hold the

3

defendant accountable for his actions, by participating in specific recommended treatment plans, which in turn can prevent recidivism.

The information in this memorandum is based one in person interview at Mr. Lin's home in Brooklyn, NY and multiple video and telephone conferences, as well as an in-person interview with his mother at her home in Queens, Xiu Xiang Fang and telephone interviews with his fiancé, Wen Wen Chen (Ivy) and cousin, Zhi Xiang Lin (Tommy). Mr. Zhi Xiang Lin was present for all correspondences for translation. During his clinical assessment, Mr. Lin presented with poor self-concept and low emotional availability. He displayed symptoms consistent with a history of trauma, a substance use disorder, and presented with multiple adverse experiences which markedly impacted his development and identity formation. These experiences additionally may have precipitated unbalanced emotional states and compromised judgment and decision-making.

In presenting this memorandum, we wish to highlight certain contributing mitigating factors that we believe promote a just and appropriate sentence and respectfully recommend that Mr. Lin be sentenced to a disposition that is no greater than necessary. These mitigating factors are:

- Significant childhood adversity including poverty, parental separation, and lack of parental support, guidance, modeling and emotional availability.
- Childhood adversity resulted in development of emotion regulatory problems, undermining social development, and increasing risk for later lapses in judgment and poor decision making.

- Mr. Lin lacked a positive male role model during major developmental stages, as his father was absent during critical stages that contribute to healthy emotional understanding, which in adulthood led to poor insight and compromising solutions.
- Mr. Lin immigrated to the United States during adolescence, a critical developmental stage, without the skills, language, resources, and support needed for successful integration into a completely different society and culture.
- Mr. Lin was a witness to domestic violence during adolescence; his father struggled with alcohol abuse and gambling disorders.
- Unbalanced emotional states led to a maladaptive response to stress, including substance use and lifestyle instability.
- Mr. Lin has expressed remorse for his actions and is capable of redemption.
- There is no previous involvement with the criminal justice system.
- Mr. Lin is the primary financial provider for his pregnant fiancé and infant son.
- He has re-established emotional ties with his biological mother and his stepfather.

## BIOPSYCHOSOCIAL HISTORY

Mr. Long Hui Lin was born without complication in Fuzhou, Fujian Province of Communist China, on March 31, 1995 to the marital union of Zhao Xiang Lin (50) and Xiu Xiang Fang (49) (see attached translated Birth Certificate as Exhibit 1a). His father left to the United States prior to his 2nd birthday. He and his mother reported they lived in very poor conditions and attempted to survive economically, with limited food and water (see Mr. Lin's mother's letter attached as Exhibit 3a). He is the only child born to his parents union.

5

Mr. Lin described a difficult childhood growing up in China. He reported his parents met while working in the cafeteria of the same factory. They formed a relationship before getting married in 1993 (his mother reports they were married in 1995). When Mr. Lin was about 1 year of age, his father immigrated to the United States, leaving him to grow up without paternal emotional support, positive influence, or developmental guidance.

When Mr. Lin was 4 years of age, his father applied for a visa for him and his mother, but due to multiple errors in paperwork, they were not granted their visa. He described that his mother struggled financially, and his father was not providing any financial support to assist him and his mother economically. Mr. Lin was enrolled in a government sponsored boarding school at the age of 5, where he resided on campus Monday through Friday, and returned home to his mother on the weekends[1]. He described his mother had to work to support herself and was unable to also be present and provide for Mr. Lin. When he first arrived at boarding school, he remembered crying everyday and waiting at the door each afternoon, hoping his mother would come to pick him up. For approximately one month, Mr. Lin waited each afternoon for his mother, but she would arrive very late, due to her long hours at work, something that contributed to his emotional ties with his mother in later stages. Mr. Lin reported witnessing physical abuse while in boarding school, but reported he was a good student, maintained a 100 average, and did not endure any abusive experiences. He shared the Chinese culture places extreme emphasis and pressure on young children to excel in education, respect elders, and to perform as they are told. He was unable to recall any specific details of being home with his mother on the weekends, but stated, "it was better than school." Mr. Lin remained at his boarding school until he immigrated to the United States in 2009.

---

[1] Boarding Schools in China-
https://www.k12academics.com/Education%20Worldwide/Education%20in%20China/boarding-schools-china

Mr. Lin reported he always knew he would immigrate to the United States, he was just unsure when. His mother had always hoped for her and her son to immigrate to the United States, to have a better life and with hopes her son could prosper in a democratic country. After their initial paperwork was processed with multiple errors in 1999, he reported it took 10 years before their documents were officially approved and visas were obtained. Mr. Lin recalled studying "hard" in China, hoping he would have an "easier experience" here in the United States.

Mr. Lin presently has a very close relationship with his mother. He reported that she depends on him and stated, "I am all that she has." Ms. Fang never remarried, but resides with her boyfriend, Zi Liu Zhang, who is fond of Mr. Lin (see attached Exhibit 3b)).

## COLLATERAL INTERVIEW WITH XIU XIANG FANG

Ms. Fang is the mother to Mr. Lin. She proudly reported that she became a U.S citizen on June 29, 2018. During her collateral interview, she reported she was born on September 3, 1971 in China. She described there was no hospital in the city where she lived and she is the youngest of three siblings, all of whom still reside in China. Ms. Fang reported being close with her siblings and they communicate via telephone. They are unaware of her son's arrest and stated, "if they found out, it would be a stigma."

Ms. Fang described growing up in "poor" conditions under Communism rule, where there was no electricity and only water and a bathroom outside the home. At the age of 18, in 1989, Ms. Fang met Zhao Xiang Lin, Mr. Lin's father. He was 20 years of age at the time and the two met working in the cafeteria of the construction company they were both employed at. They were mandated by the company they worked for to be married after the age of 24, so the pair married when Ms. Fang was 24. Initially, she reported she was unable to live with her

husband, but she later lived in a unit (like a dorm) from her company, which she described as similar to a bonus. She described it was one room, with no kitchen or bathroom. They used the cafeteria for meals and the bathroom. She did report that if they were not compliant with the company, they could be fired or evicted from their living quarters. Shortly after marriage, Ms. Fang gave birth to her son, who also resided in the company's dorm.

Ms. Fang described a "good marriage" in the beginning, but in 1996 Mr. Lin immigrated to the United States. She reported they planned to go as a family, however their son's birth certificate was not legible due to it being handwritten; therefore, they were unable to provide all necessary documents for their applications. Ms. Fang and her son remained in the company's living quarters and struggled financially.

Ms. Fang reported due to her dire financial situation, she was forced to send her son to boarding school, as she could not afford to care for him, nor did she have enough time to devote to him. Mr. Lin attended boarding school Monday through Friday beginning in Kindergarten through the time he immigrated to the United States with his mother in 2009. Ms. Fang reported her son was an exceptional student in China, with no academic or behavioral issues. Ms. Fang described a difficult 13 years being separated from her husband. Not only did she struggle herself, but her husband never came to visit, despite having the ability to do so, and he never sent his wife and son money. She reported he became involved in gambling in the United States and commenced another relationship.

In 2009, after 13 years of being separated, Ms. Fang and her son came to the United States with the hope of reuniting with Mr. Lin's father and to pursue better economic opportunities. Ms. Fang and her son resided in Chinatown, New York and lived in various family members' restaurants. For several months they slept on chairs. Ms. Fang reported she

had no money, and she was not working. She learned her husband had had an affair and he was not helping to support her and her son. Several months later, Ms. Fang reportedly found someone who allowed her and her son to sleep in the living room. Ms. Fang worked in various restaurants in Chinatown and earned approximately $1,300 per month. Ms. Fang reported despite her husband's lack of support, he came to visit them often; however, he was physically abusive towards her, something her son witnessed. Ms. Fang filed for divorce, which was granted on April 11, 2012 (see attached Judgment of Divorce as Exhibit 1b)

Ms. Fang and her son struggled to assimilate to his new environment and were deeply affected by the absence of his father. He did not speak often, and he had no friends. He began school in the 9th grade and Ms. Fang was informed by the school that her son was not communicating with others. After several months, Ms. Fang reported his experience improved. He met some friends he enjoyed playing basketball with and he helped his mother at her restaurant. Mr. Lin did not finish high school and at the age of 18, he met a girlfriend, who is now his wife and moved in with her. He has not lived with her since.

Ms. Fang met her boyfriend Zi Liu Zhang (57), shortly after she filed for a divorce from Mr. Lin's father. She reported Mr. Zhang is employed trading stocks and owns a rental property. He owns a home in Queens and children from a prior relationship, his daughter (20), and son (30) also reside with him. Ms. Fang reportedly lost her job, working in a restaurant as a waitress, in 2020 due to the COVID-19 pandemic and moved into her boyfriend's home.

Ms. Fang reported her son visits her and she also maintains a good relationship with his fiancé's family. She expressed her concern if her son is sentenced to a period of incarceration. She reported she may have to return to work to assist Ms. Chen and her children financially and would also offer them a place to live with her and her boyfriend.

9

Ms. Fang added that going back to work would be difficult due to her medical health. She reported that after many years of working in restaurants, she suffers from chronic back and shoulder pain (see Physicians letter attached as Exhibit 1d). She currently takes the following medications: Naproxen, 500mg 2x daily and Gabapentin, 300mg at bedtime.

## ARRIVAL IN THE UNITED STATES AND EXTREME HARDSHIPS

Mr. Lin described an incredibly difficult transition and acculturation period after immigrating to the United States. He reported his father was unhelpful and not supportive (emotionally and financially) and did not provide Mr. Lin and his mother a place to live. For several months, Mr. Lin and his mother slept in a relative's restaurant, on chairs, in Downtown Manhattan. He reported sometimes he and his mother would sleep at a relative's house for one night. Three months after immigrating, Ms. Fang found a room that she and her son shared. He remembered having enough food to eat and appropriate clothing for each season, but that was all. Ms. Fang eventually found a job for very limited income in a restaurant. Mr. Lin reported though his father had his own apartment with his girlfriend, he would come to see Mr. Lin and his mother often. He struggled with alcoholism and a gambling disorder and became physically abusive towards Ms. Fang, when intoxicated. Mr. Lin witnessed his father physically abuse his mother for approximately 6 months. His mother filed for divorce "a few years" after she immigrated to the United Stated. The divorce submitted by Ms. Fang, index # 315292/2011, was "dissolved" due to "the relationship between Plaintiff and Defendant has broken down irretrievably for a period of at least 6 months". The divorce settlement also rendered a child support of $25.00 a month payment by his father and the directive for an application for health insurance for Mr. Long Hui Lin (see attached Exhibit 1d).

Without his father's support, Mr. Lin became increasingly resentful, angry, and unmotivated. He attended the University Neighborhood High School, a school ranked 486 out of 520 high schools in NYC, where he struggled to assimilate[2]. He did not know the English language, he did not have any friends, he did not have a stable home, his mother was working very long hours, he was lonely, and felt he had no one to talk to. He reported working hard in China to eventually help his father here in the United States. However, he reported his father "wanted nothing to do with [him]," which contributed to Mr. Lin's loss of motivation and self-esteem. Mr. Lin did not graduate high school and completed through the 11th grade.

At the age of 18, Mr. Lin believed he was becoming a burden to his mother, who was already suffering and struggling financially, so he decided to move out and support himself. He never maintained a stable residence on his own, but spent several days at a friend's house, before spending another several days at another friend's house. Mr. Lin was unemployed and relied on his friends for all of his needs. At the age of 20, he relocated to West Virginia for three months, to learn the Hibachi style of cooking, in exchange for room and board. He admitted to not enjoying the lifestyle in West Virginia and returned to Brooklyn, where he obtained employment in several restaurants in Manhattan.

From the age of 18-24, Mr. Lin has lacked steady employment as well as a stable residence and no guidance of emotional support. He resided with friends for several days at a time and relied on them for food and transportation. He also briefly resided with a girlfriend in Brooklyn. When he was working, he often was paid in cash, or traded work for room and board. He reported his mother has helped him financially, and more recently, his fiancé's family has helped support him and his family.

---

[2] https://www.usnews.com/education/best-high-schools/new-york/districts/new-york-city-public-schools/university-neighborhood-high-school-13059

11

Mr. Lin is currently in a relationship with Wen Wen Chen (26), and they have a son Lin Elson (1.5) and a second child due to be born on December 13, 2021. Mr. Lin currently resides at rented apartment at 1223 78th Street, on the first floor, in Brooklyn, New York. Mr. Lin moved into his current apartment with his fiancé in July 2020. He reported that he presently relies on his wife's family to assist him with payment of the rent.


## COLLATERAL INTERVIEW WITH WEN WEN CHEN

Ms. Chen was born in Taisan City, China where her parents owned an electronics store. She described an "average" family and reported she did well in school. She immigrated to the United States in 2013 with her mother, father, and brother, and her family settled in Brooklyn. She reported coming to the United States to complete high school, but struggled, as she was older than her peers and was not proficient in the English language. She resided with her family in Brooklyn and her parents secured employment in a watch company factory. Ms. Chen reported being grateful she did not need to work while attending high school.

Ms. Chen did not complete high school and at the age of 19, dropped out as a sophomore. She continued living with her family in Brooklyn and obtained employment in a dessert store. She moved out of the family home at the age of 23 and lived with her friends for one year before meeting Mr. Lin in 2018 at a wedding party. After a short courtship, they decided to reside together.

Ms. Chen described a "normal" relationship with Mr. Lin and reported going to dinner and a movie is her favorite thing they do together. The pair began dating and she became pregnant less than one year of the pair being together. Though the pregnancy was not planned, both were excited to welcome their infant son. She denied significant relationship challenges

12

and reported her priorities and focus changed after giving birth to her son on December 2019; ironically they were able to spend significant and special time together as a family as a result of the COVID-19 pandemic. Ms. Chen reported a healthy pregnancy and denied all complications. She reported her son had an allergy to her breast milk and required special formula and frequent feedings, which her husband assisted with. She described Mr. Lin is very supportive and caring as a partner and father and makes himself available for every appointment. She admitted that she became more family-oriented and committed to their relationship and their family.

Prior to learning she was pregnant for a second time (see attached Exhibit 1c), Ms. Chen was able to return to work in a restaurant in Chinatown. Due to the unknown effects of COVID-19 on a pregnant woman, she stopped working to remain safe and healthy. It was also because it is expected and encouraged in Chinese culture that a woman stays home while pregnant.[3] Mr. Lin and Ms. Chen were engaged in 2020 and their plans to marry were put on hold due to the city clerk's office being closed during the COVID-19 pandemic. Mr. Lin described his relationship with Ms. Chen as "supportive and very good." He reported they communicate openly with one another and make difficult decisions together. He is grateful for her family, who has been assisting them financially. Ms. Chen's mother, Yue Ping Huang was previously diagnosed with a serious ailment and is unable to work, but her family is still able to assist them with limited financial resources (Medical Records can be made available upon request). Mr. Lin maintains a strong relationship parent's in law and they participate in rearing the child. He reported they are there to care for him, spend time with him, and play with him, but would be

---

[3] There are many traditional Chinese pregnancy restrictions to protect the child from "malign influences" and to avoid the problems associated with pregnancy and birth, such as miscarriage, stillbirth, death of the mother, and imperfections in the newborn. The basic concepts of these restrictions come from the notion of yin and yang, the Taoist philosophy of one's harmony with the universe. There is great emphasis on dietary and behavioral restrictions to restore physical and emotional harmony, including limitations on strenuous and physical work. Retrieved from https://www.sciencedirect.com/science/article/pii/S1976131712000060

unable to have their daughter live with them, specifically since they have limited space at home and she is pregnant with a second child.

Ms. Chen is worried about the outcome of Mr. Lin's sentencing. She is currently pregnant with their second child and is due in December of this year. The pregnancy was unplanned and at first had serious concerns about how they will now have to deal with two children to take care of. She is worried if he is sentenced to a period of incarceration, she will be alone in the home with two small children and no income, as he is the primary and sole financial provider. In addition, Ms. Chen will be required to "sit in" and "do the month," a Chinese pregnancy tradition characterized by a structured month of rest following childbirth.[4]   She reported her parents live approximately 20 minutes away, but her mother is recovering from breast cancer surgery and her father was recently in a car accident; therefore, they will not be available to assist her with as many things as she will need. Mr. Lin's mother currently resides on border of Queens and Long Island and is currently in physical therapy for shoulder and back issues, indicating she is not in optimal health (See Medical Records and physician's letter attached as Exhibit).

## RELATIONSHIPS WITH EXTENDED FAMILY

Mr. Lin's cousin, Lin Zhi Xiang, also known as Tommy, was born in Hong Kong and came to the United States in 2003. Mr. Lin did not meet Tommy until he came to the United States in 2009. He is a paternal second cousin who was living upstate, New York at the time Mr. Lin immigrated. He visited New York City on school breaks. Tommy reported he and Mr. Lin

---

[4] For thousands of years, new mothers take part in the Chinese tradition of "doing the month" or "sitting in." The act is also known as "postnatal confinement" whereby for the first 30-40 days after birth, the mother does not leave home, entertain visitors or shower. In addition, she may be required to eat or avoid certain foods, minimize activity and exercise, avoid wind, avoid climbing stairs, and refrain from watching television. Retrieved from https://ltl-taiwan.com/chinese-pregnancy-traditions/

would spend time together in the local park and explore Chinatown with one another. He described they have a "special bond" as Tommy also grew up without a father. He stated, "I understand his situation and the difficulties he is facing." Tommy is an entrepreneur and owns a successful company that rebuilds homes and then places them on the real estate market. He has committed himself to assist Mr. Lin in moving forward and be supportive.


## EDUCATIONAL AND EMPLOYMENT HISTORY

Mr. Lin attended a boarding school in China from the age of 5 through 15, until he immigrated to the United States in 2009. He denied educational and behavioral difficulty and reported a 100 average. He attended the University Neighborhood High School in Manhattan, repeating the 9th grade due to his lack of English proficiency. He reportedly was not successful in school and progressively lost motivation to attend classes and complete his education. He discontinued his formal education after completing the 11th grade in high school.

Mr. Lin reported a minimal work history in the United States, until the age of 20, when he relocated to West Virginia to learn the Hibachi style of cooking. He returned to Manhattan after three months and maintained employment in various restaurants. Mr. Lin lost his employment during the COVID-19 pandemic in March 2020. He traveled upstate New York, to work in a friend's restaurant, but returned home shortly thereafter. He remained unemployed and was arrested in August 2020. After the arresting incident, Mr. Lin was unemployed for a period, before being approved by pretrial services to obtain a job. Since December 2020, he has been employed as a cashier at a spa in Brooklyn, where he works Monday through Friday from 2:00PM – 9:00PM and earns $15 per hour.

Mr. Lin has goals to pursue construction and real estate and follow in the footsteps of his cousin. His primary goal is to provide for his family and continue working at the spa until he gains enough experience to transition to a career.

## ALCOHOL AND SUBSTANCE USE HISTORY

Mr. Lin reported a history of substance use commencing at age 21. Prior to that age he denied use and experimentation with opiates, marijuana, cocaine, amphetamines, and benzodiazepines. He reported minimal alcohol use, in social settings. He reported use of Ketamine for the first time at the age of 21, as he was going through stress and some anxiety that related to lack of employment, when he was introduced to Ketamine by friends at a party. He reported when using Ketamine, "all [his] problems go away." He reported weekly use of Ketamine from 2016 through 2018; he discontinued using when his fiancé was pregnant with their first child. Prior to his arrest for the instant offense, he reported use on one occasion. He denied a history of substance use treatment. He has expressed an interested in counseling to deal with the contributors of his prior drug use and supporting his abstinence.

Ketamine, a unique psychoactive substance, produces effects of dissociative anesthesia and analgesia at clinical doses; however, at recreational doses of sub-anesthetic levels, it could produce a psychedelic experience of incredible intensity. Hence, ketamine has emerged as a recreational drug in nightclubs and the prevalence of ketamine uses is increasing worldwide. Short-term exposures to ketamine at sub-anesthetic doses have been observed to produce impairments of cognitive functions and perceptual alternations, impaired visions, delusions, depersonalization and derealization in healthy individuals and long-term exposure has been linked to cell death in the prefrontal cortex and significant impairment and disruption in multiple

brain structures, regions and functions, including overall decreased brain volume.[5]  Ketamine users consistently show worse performance in self-reported impulsivity and antisocial traits when compared to non-ketamine users.[6]  The prefrontal cortex (PFC) has been the focus of investigations in drug use. The PFC is responsible for our highest-order cognitive and executive processes, and regulates our thoughts, actions, and emotions through extensive connections with other brain regions. These abilities depend on proper PFC neuronal network connections, which are sensitive to their neurochemical environment.  Ketamine use disrupts the neurochemical environment of the PFC,[7] thereby impacting cognitive and executive function.

## LEGAL HISTORY

Mr. Lin has no previous involvement in the criminal justice system.

## MEDICAL AND PHYSICAL HEALTH HISTORY

Mr. Lin denied a significant medical history including illness, disease, surgery, or hospitalization.

## MENTAL HEALTH HISTORY

Mr. Lin reported a history of nightmares and difficulty sleeping as a child, as a result of witnessing domestic violence and residential instability. He additionally reported a period where he lacked motivation, specifically after he immigrated to the United States and learned that his father was "not who he thought he was." Mr. Lin denied a history of mental health treatment or

---

[5] Sun, L., Li, Q., Zhang, Y., Liu, D., Jiang, H., Pan, F. & Yew, D.T. (2012). Chronic ketamine exposure induces permanent impairment of brain functions in adolescent cynomolgus monkeys, *Addiction Biology,* 19, 185-194.

[6] Zeng, H., Su, D., Jiang, X., Zhu, L. & Ye, H. (2016). The similarities and differences in impulsivity and cognitive ability among ketamine, methadone, and non-drug users, *Psychiatry Research,* 243, 109-114.

[7] Sun, L., Li, Q., Zhang, Y., Liu, D., Jiang, H., Pan, F. & Yew, D.T. (2012). Chronic ketamine exposure induces permanent impairment of brain functions in adolescent cynomolgus monkeys, *Addiction Biology,* 19, 185-194.

17

use of psychotropic medications. It is important to note that Mr. Lin's substance use may be used as a means of coping with distressing symptoms for which he is unable to identify. A full psychiatric evaluation would be recommended to determine the severity of any underlying symptoms of distress.

Presently he denied a history of symptoms as an adult that are consistent with diagnosable mental illness. He denied experiencing mood or affect indicative of persistent mental illness, personality or thought disorder. He denied feelings of sadness, anger, frustration, irritability, loneliness, and somatic complaints. He denied all high-risk symptoms including suicidality and homicidality. But most recently he has found himself lacking energy and feeling anxious and depressed due to his legal situation and the potential outcome if he is incarcerated and then leaves his wife alone with two children.


**CLINICAL ASSESSMENT**

Long Hui Lin is a 26-year-old single, Asian male born in China. He presented in first session as appropriately dressed was well groomed, of average height and stature and displayed appropriate eye contact. He demonstrated flat affect and apathetic mood, with a cooperative demeanor and displayed appropriate behavior. In additional interviews conducted via video conference and phone, he spoke at a typical rate of speech with clear sound and average intensity of volume and responses were translated via interpreter. Psychomotor behaviors were within normal limits and no abnormal movements were noted. He presented with adequate attention and concentration. His memory appeared intact, but it was difficult to obtain significant details of life events, possibly due to a language or cultural barrier. He demonstrated intellectual awareness and limited emotional insight into his current situation. His thoughts were consistent

with reality and there is no evidence of a thought disorder. He denied all active high-risk symptoms including suicidal and homicidal ideation, intent, and plan.

It is with conviction that we believe Mr. Lin is suffering the effects of adverse childhood experiences and significant developmental disruption and affecting his global reasoning. His experiences have directly influenced his social and emotional development which has led to functional changes in the brain, influencing later decision-making skills, cognitive processing ability and levels of distress tolerance. From a young age, he has struggled with meager emotional and economical resources and difficulty in affect modulation and developed a maladaptive set of coping and problem-solving skills to manage the pain associated with negative experiences in major developmental stages leading to adulthood.

Children raised in high-stress environments, who experience limited socio-economic resources which limited the most common necessities and are subject to high levels of family conflict and negative relationships with parents and who are later exposed to delinquent peers as adults, often develop abnormally and exhibit problem behaviors that are destructive to themselves and others.[8] Children from disrupted families are also at increased risk of antisocial behavior and delinquency compared to children from intact homes.

In the case of Mr. Lin, his father left him and his mother when he was 1.5 years of age. Father-child interactions are not only critical during the first few years of development but are primarily responsible for shaping children's adaptive socio-emotional development.[9] Father absence is a contributing factor to the poorer well-being of children and related to decreased cognitive ability and development, poor social adjustment and increased risk in delinquency.[10]

---

[8] Chaffin, M., Berliner, L., Block, R., Johnson, T. C., Friedrich, W. N., Louis, D. G., ... & Madden, C. (2008). Report of the ATSA task force on children with sexual behavior problems. *Child Maltreatment*, *13*(2), 199-218.
[9] Easterbrooks, M.A., Raksin, M., McBrian, S.F. (2014). Father involvement and toddlers' behavior regulation: evidence from a high social risk sample. *Fathering*, 12(1), 71-93.
[10] Flouri, E. & Buchanan, A. (2003). The role of father involvement in children's later mental health. *Journal of Adolescence*, 26, 63-78.

The absence of a father relationship additionally impacts an adolescent's ability to make sound decisions, as in the instant matter of Mr. Lin, as well as triggers negative reactions to outside stimuli. Emotional development is stunted, and the successful development and utilization of healthy coping skills is restricted.[11]  Mr. Lin has no memory of the first 1.5 years of his life before his father left. He and his mother struggled financially with very few outlets or resources. Living in a communist society also limited the necessary resources to gain social stability.

The absence of his father, as an only child contributed to limited emotional growth and created low-self esteem, which in turn created poor decision making. When he was reunited with his father at the age of 15, he had already built a new life, one that did not include his son. This exclusion greatly affected his identity and role as a young male with a mother who was in need and in economical instability. When he reunited with his father their time together was sporadic, unsupportive, and abusive in nature. Relationships were fractured, attachments were strained, and tensions and conflict were high, all having an adverse effect on his development.  He ultimately lost motivation to succeed and embarked on a path of disruption and instability, lacking the skills, resources and motivation needed to obtain employment and his own stable residence.  Biological research has recently shown that early childhood adversity is associated with neural, endocrine, immune, metabolic, and gut microbial effects.[12]  Extensive childhood adversity is linked to impairments in executive functioning, emotion regulation, social functioning, reward processing and stress regulation.

Growing up in a chaotic environment was normalized for Mr. Lin, something he paralleled as he grew older.  When he learned he lacked the skills and resources needed to

[11] Flouri, E. & Buchanan, A. (2003). The role of father involvement in children's later mental health. *Journal of Adolescence*, 26, 63-78.
[12] Berens, A.E., Jensen, S.K.G. & Nelson, C.A. (2017). Biological embedding of childhood adversity: from physiological mechanisms to clinical implications. *BMC Medicine, 15,* 135-147.

succeed, he found a sense of safety and security in an environment where emotional expression was unnecessary for success, belonging or acceptance.

Research has documented stress as "an experience denoting adversity."[13]  According to research, the stress response is based on the prior emotional state of the individual.[14]  Meaning, an unbalanced prior emotional state is more likely to precipitate a more maladaptive response to stress, impacting judgment and decision-making skills.  Mr. Lin displayed a long history of unbalanced emotional states due to his childhood and early development, increasing his vulnerability to later maladaptive responses to stress, including substance use and his behavior involved in the instant offense.  A lack of prosocial coping skills prevents an individual from successfully dealing with the stressors associated with everyday living, but further inhibits coping with the increasing stresses associated with a lack of self-esteem, developmental disruption, and lifestyle instability.

The harmful effects of childhood and adolescent adversity on a number of physical and emotional health related outcomes are well established.  Childhood and adolescent adversities include difficult, stressful, or traumatic life experiences.[15]  For Mr. Lin, his father's absence, growing up in poverty, and in a single-parent household, developmental disruption, immigration experience which created challenging assimilation to the community, society and his peers, homelessness with his mother, who was considered his main familial support, and witnessing domestic violence represent significant adversity.  Adverse childhood experiences have been shown to be associated with later poorer physical and general health, and more recently,

---

[13] Keyes, K.M., Hatzenbuehler, M.L. & Hasin, D.S. (2011). Stressful life experiences, alcohol consumption, and alcohol use disorders: the epidemiologic evidence for four main types of stressors. *Psychopharmacology*, 218, pp.2.

[14] Sinha, R. (2001). How does stress increase risk of drug abuse and relapse? *Psychopharmacology*, *158*(4), 343-359.

[15] Wolitzky-Taylor, K., Sewart, A., Vrshek-Schallhorn, S., Zinbarg, R., Mineka, S., Hammen, C., Bobova, L., et al. (2017). The effects of childhood and adolescent adversity on substance use disorders and poor health in early adulthood. *Journal of Youth and Adolescence*, 46, 15-27.

emotional health as well as an elevated prevalence of substance use problems[16] and delinquency.[17]  Childhood adversity may lead to the development of risk-taking behaviors, including substance use and delinquency.[18]  In adulthood these characteristics are super imposed due to developing life circumstances, such as establishing a relationship, leading to marriage and children, which all require planning in many phases, which include economic and emotional support.

Toxic stress in childhood is associated with structural changes in the brain, causing affective and behavioral dysregulation and impaired cognitive functioning.[19]  When faced with physical or psychological threats in the environment, the body and mind respond both biologically and cognitively to cope and adapt.  Early traumagenic environments can create an overproduction of stress-related hormones associated with hyperarousal, which then hinders the growth and connection of neurons.[20]  These neurological changes have lifelong consequences related to emotional management, social attachment, and cognitive processing, and often provoke the adoption of high-risk behaviors as coping strategies.[21]  For Mr. Lin, both his substance use and involvement in the instant offense reflect high-risk behaviors, primarily due to his abnormal human development as a whole.  When children grow up in homes with repeated exposure to physical or psychological threats, they are prone to neurobiological alterations as the mind and body seek to respond to and manage danger in the environment.[22]  As the brain

---

[16] Wolitzky-Taylor, K., Sewart, A., Vrshek-Schallhorn, S., Zinbarg, R., Mineka, S., Hammen, C., Bobova, L., et al. (2017). The effects of childhood and adolescent adversity on substance use disorders and poor health in early adulthood. *Journal of Youth and Adolescence,* 46, 15-27.
[17] Brown, S.M. & Shillington, A.M. (2017). Childhood adversity and the risk of substance use and delinquency: The role of protective adult relationships. *Child Abuse and Neglect,* 63, 211-221.
[18] Brown, S.M. & Shillington, A.M. (2017). Childhood adversity and the risk of substance use and delinquency: The role of protective adult relationships. *Child Abuse and Neglect,* 63, 211-221.
[19] Levenson, J. & Grady, M. (2015). Childhood adversity, substance abuse and violence: Implications for trauma-informed social work practice. *Journal of Social Work Practice in the Addictions,* 16, 24-45.
[20] Levenson, J. & Grady, M. (2015). Childhood adversity, substance abuse and violence: Implications for trauma-informed social work practice. *Journal of Social Work Practice in the Addictions,* 16, 24-45.
[21] Levenson, J. & Grady, M. (2015). Childhood adversity, substance abuse and violence: Implications for trauma-informed social work practice. *Journal of Social Work Practice in the Addictions,* 16, 24-45.
[22] Levenson, J. & Grady, M. (2015). Childhood adversity, substance abuse and violence: Implications for trauma-informed social work practice. *Journal of Social Work Practice in the Addictions,* 16, 24-45.

changes because of hyperarousal, a maltreated child's capacity to regulate emotion and behavior, and maintain a cohesive sense of self are compromised,[23] as in the case of Mr. Lin and his adoption of high-risk behaviors and lifestyle instability. When children are faced with multiple and repeated stressors, their capacity to cope effectively might be compromised, leading to innumerable consequences across the lifespan.[24]

The long-term effects of childhood trauma include alterations in stress systems. Childhood maltreatment has been linked to permanent alteration of the hypothalamic-pituitary-adrenal (HPA) axis with damaging effects on the developing brain which may lead to behavioral problems later in life. Childhood trauma interferes with stress-regulatory genes resulting in poor decision-making performance, specifically in transitional stages in life. Early life stress can induce persistent changes in stress neurotransmitters and the serotonin system. Both are crucial for correct decision-making. Early adversity impairs the normal development of these biochemical pathways and consequently leads to altered decision-making.[25]

The accumulation of multiple stressors beginning in early childhood has prevented Mr. Lin from developing, learning and applying emotion regulation and coping skills needed for successful development and decision-making as a young adult entering into complex part of life, which is having a relationship, getting married and then having children. New stressors combined with his previous lifetime exposure to stressors and negative life events for which he never successfully coped, created significant negative decisions which resulted in the current arresting incident.

---

[23] Levenson, J. & Grady, M. (2015). Childhood adversity, substance abuse and violence: Implications for trauma-informed social work practice. *Journal of Social Work Practice in the Addictions,* 16, 24-45.

[24] Levenson, J. & Grady, M. (2015). Childhood adversity, substance abuse and violence: Implications for trauma-informed social work practice. *Journal of Social Work Practice in the Addictions,* 16, 24-45.

[25] Guillaume, S. Perroud, N., Jollant, F., Jaussent, I., Olie, E., Malafosse, A. & Courtet, P. (2013). HPA axis genes may modulate the effect of childhood adversities on decision-making in suicide attempters. *Journal of Psychiatric Research.* 47, 259-265.

## SENTENCING RECOMMENDATIONS

It is evident that Mr. Lin has struggled with positive identity formation as a result of early childhood experiences, his father's absence, growing up in poverty and in a single-parent household, developmental disruption, poor immigration experience, sporadic homelessness, and witnessing domestic violence at a young age. He has endured a series of negative experiences throughout his development, suffering significant psychological consequences. Nevertheless, Mr. Lin is committed to bettering himself and his life beginning with taking accountability and responsibility for his actions. He has accepted the fact that he needs treatment for substance use, classes on parenting and also formal therapy that can assist him with dealing with future anxiety due to life stressors. Our office can facilitate a treatment plan and recommended providers or assist the U.S. Department of Probation in formalizing a referral to the appropriate services.

As a repercussion of long and short term incarceration, children often suffer significantly when parents are removed from the home. Studies have shown that some children of incarcerated men experience significant psychological stress and acting-out behaviors following their father's incarceration.[26] The most commonly cited adverse reactions include internalizing behaviors such as depression and difficulty forming attachments as well as externalizing behaviors such as aggression and delinquent activity. Moreover, children of incarcerated parents exhibit difficulty sleeping and concentrating, have little to no emotional support, may withdraw emotionally from school, engage in truancy, drug use, early pregnancy and diminished academic performance.[27] Additionally, children may internalize social norms following their father's incarceration and changes in parental working conditions are known to affect children's social

---

[26] Balthazar, M.L. & King, L. (2001). The loss of protective effects of relationships on incarcerated African American men: implications for social work. *Journal of African American Men,* 6(1), 31-41.
[27] Miller, K.M. (2006). The impact of parental incarceration on children: an emerging need for effective interventions. *Child and Adolescent Social Work Journal,* 23(4), 472-486.

adjustment.[28]   Lastly, children with parents in prison are 5-6 times more at-risk to become involved in the criminal justice system.[29]  Mr. Lin is the father to a young son and his fiancé is currently pregnant with their second child and a period of incarceration will only increase the propensity for challenges and adversity for them.  In addition, Mr. Lin is currently the sole financial provider for the family, and should he be sentenced to incarceration, Ms. Chen will experience significant challenges providing economic and emotional support/care for their children in pinnacle infant stages, which would be similar to Mr. Lin's biopsychosocial history.

Research has indicated that incarceration not only has a psychological effect on the offender and family, but a great economic effect, specifically a permanent impact on the offender's earning potential.   Studies have documented that suffering a conviction and imprisonment has a permanent impact on earning potential, diminishing men's earnings by up to 30 percent even long after leaving prison.  This has the potential to lead to increased stress and financial difficulties.  It will be essential for Mr. Lin to have access not only to employment opportunities to support his family, but access to individualized mental health counseling, where he can begin to address the depths of his trauma, adversity, and negative experiences and the underlying symptoms that contributed to his Ketamine use.  Should Mr. Lin be sentenced to a period of incarceration, he will lack access to this clinically necessary mental health treatment, mental health symptoms will be exacerbated, and he will be at an increased risk for psychological decline, which will undoubtedly affect his immediate family.

We do not intend on negating the criminal conduct that led to his arrest, but respectfully request that the Court and United States Attorney's Office consider the existing mitigating factors in the report and acknowledge that a disposition including a period of incarceration is not

---

[28] Balthazar, M.L. & King, L. (2001). The loss of protective effects of relationships on incarcerated African American men: implications for social work. *Journal of African American Men,* 6(1), 31-41.
[29] Miller, K.M. (2006). The impact of parental incarceration on children: an emerging need for effective interventions. *Child and Adolescent Social Work Journal,* 23(4), 472-486.

warranted for an individual like Mr. Lin, given his lengthy and complex developmental history, lack of contact with the judicial system, possessing a high potential of rehabilitation and redemption. Access to treatment combined with community supervision will allow him to focus on his unresolved emotional challenges, build a solid foundation of healthy coping, problem solving and decision-making skills, learn critical life skills, and gain a deeper understanding into the current and previous stressors impacting his optimal well-being, leading to a concrete solution to prevent recidivism.

The Consulting Project would like to thank the Court and United States Attorney's Office for its review and consideration of the contents in this memorandum and is hopeful that the Court will concur with our recommendation.

Respectfully submitted,

Mandi Budah, MA, LCSW
Forensic Social Worker

Reynaldo Cusicanqui, BA
Forensic Mitigation Specialist
CONSULTING PROJECT

EXHIBIT 1(A-D)

NOTARIAL CERTIFICATE
(Translation)


(2001) Rong Zi, No. 5453


This is to certify that Lin Longhui (male)
was born on March 31, 1995 at Fuzhou, Fujian
Province. Lin Longhui's father is Lin Zhaoxiang
and his mother is Fang Xiuxiang.


Notary: Mao Weiwang
Fuzhou Notary Public Office
Fujian Province
The People's Republic of China
Feb. 21, 2001

出 生 证 明 书

(2001)榕公证字第 5453 号

　　兹证明林龙辉(男)于一九九五年三月三十一日
在福建省福州市出生。林龙辉的父亲是林兆想,林龙
辉的母亲是方秀香。

中华人民共和国福建省福州市公证处



公证员

二〇〇一年二月二十一日

235742

1

2

3

At the *Matrimonial/IAS* Part 20
of New York State Supreme Court at
the Courthouse, New York
County, on Feb. 22, 2012.

Present:

4   Hon. **HON. DEBORAH A. KAPLAN** *Justice/Referee*
----------------------------------------------------------------X

5

6   FANG, Xiu Xiang

Plaintiff,

-against-

Index No.: 315292/2011
Calendar No.:
Social Security No.:

**JUDGMENT OF DIVORCE**

7   LIN, Zhao Xiang

Defendant.
----------------------------------------------------------------X

**EACH PARTY HAS A RIGHT TO SEEK A MODIFICATION OF THE CHILD SUPPORT ORDER UPON A SHOWING OF: (I) A SUBSTANTIAL CHANGE IN CIRCUMSTANCES; OR (II) THAT THREE YEARS HAVE PASSED SINCE THE ORDER WAS ENTERED, LAST MODIFIED OR ADJUSTED; OR (III) THERE HAS BEEN A CHANGE IN EITHER PARTY'S GROSS INCOME BY FIFTEEN PERCENT OR MORE SINCE THE ORDER WAS ENTERED, LAST MODIFIED, OR ADJUSTED; HOWEVER, IF THE PARTIES HAVE SPECIFICALLY OPTED OUT OF SUBPARAGRAPH (II) OR (III) OF THIS PARAGRAPH IN A VALIDLY EXECUTED AGREEMENT OR STIPULATION, THEN THAT BASIS TO SEEK MODIFICATION DOES NOT APPLY.**

8   **THE FOLLOWING NOTICE IS ☐ *APPLICABLE*   OR ☑ *NOT APPLICABLE***

**NOTICE REQUIRED WHERE PAYMENTS THROUGH SUPPORT COLLECTION UNIT**

**NOTE: (1) THIS ORDER OF CHILD SUPPORT SHALL BE ADJUSTED BY THE APPLICATION OF A COST OF LIVING ADJUSTMENT AT THE DIRECTION OF THE SUPPORT COLLECTION UNIT NO EARLIER THAN TWENTY-FOUR MONTHS AFTER THIS ORDER IS ISSUED, LAST MODIFIED OR LAST ADJUSTED, UPON THE REQUEST OF ANY PARTY TO THE ORDER OR PURSUANT TO PARAGRAPH (2) BELOW. UPON APPLICATION OF A COST OF LIVING ADJUSTMENT AT THE DIRECTION OF THE SUPPORT COLLECTION UNIT, AN ADJUSTED ORDER SHALL BE SENT TO THE PARTIES WHO, IF THEY OBJECT TO THE COST OF LIVING ADJUSTMENT, SHALL HAVE THIRTY-FIVE (35) DAYS FROM THE DATE OF MAILING TO SUBMIT A WRITTEN OBJECTION TO THE COURT INDICATED ON SUCH ADJUSTED ORDER. UPON RECEIPT OF SUCH WRITTEN OBJECTION, THE**

(Form UD-11 - Rev. 10/10)

COURT SHALL SCHEDULE A HEARING AT WHICH THE PARTIES MAY BE PRESENT TO OFFER EVIDENCE WHICH THE COURT WILL CONSIDER IN ADJUSTING THE CHILD SUPPORT ORDER IN ACCORDANCE WITH THE CHILD SUPPORT STANDARDS ACT.

(2) A RECIPIENT OF FAMILY ASSISTANCE SHALL HAVE THE CHILD SUPPORT ORDER REVIEWED AND ADJUSTED AT THE DIRECTION OF THE SUPPORT COLLECTION UNIT NO EARLIER THAN TWENTY-FOUR MONTHS AFTER SUCH ORDER IS ISSUED, LAST MODIFIED OR LAST ADJUSTED WITHOUT FURTHER APPLICATION BY ANY PARTY. ALL PARTIES WILL RECEIVE A COPY OF THE ADJUSTED ORDER.

(3) WHERE ANY PARTY FAILS TO PROVIDE, AND UPDATE UPON ANY CHANGE, THE SUPPORT COLLECTION UNIT WITH A CURRENT ADDRESS, AS REQUIRED BY SECTION TWO HUNDRED FORTY-B OF THE DOMESTIC RELATIONS LAW, TO WHICH AN ADJUSTED ORDER CAN BE SENT, THE SUPPORT OBLIGATION AMOUNT CONTAINED THEREIN SHALL BECOME DUE AND OWING ON THE DATE THE FIRST PAYMENT IS DUE UNDER THE TERMS OF THE ORDER OF SUPPORT WHICH WAS REVIEWED AND ADJUSTED OCCURRING ON OR AFTER THE EFFECTIVE DATE OF THE ADJUSTED ORDER, REGARDLESS OF WHETHER OR NOT THE PARTY HAS RECEIVED A COPY OF THE ADJUSTED ORDER.

*9*      This action was submitted to ☐ *the referee* **OR** ☑ *this court*  for ☑ *consideration*

this 22nd day of Feb. 2012  **OR**  for ☐ *inquest* on this _____ day of _____.

*10*      The Defendant was served ☑ *personally*    **OR** ☐ pursuant *to court order dated*

_____ ☑ *within*  **OR** ☐ *outside*   the State of New York.

*11*      Plaintiff presented a ☐ *Verified Complaint and Affidavit of Plaintiff constituting the facts*

*of the matter* **OR** ☑ *Summons With Notice and Affidavit of Plaintiff constituting the facts of the matter.*

(Form UD-11 - Rev. 10/10)·

12      The Defendant has ☑ *not appeared and is in default* **OR** ☐ *appeared and waived his or her right to answer* **OR** ☐ *filed an answer or amended answer withdrawing any prior pleadings and neither admitting nor denying the allegations in the complaint and consenting to the entry of judgment* **OR** ☐ *the parties settled the ancillary issues by* ☐ *written stipulation* **OR** ☐ *oral stipulation on the record dated* _____.

13      The Court accepted ☑ *written* **OR** ☐ *oral* proof of non-military status.

14      The Plaintiff's address is 13 Market Street #5, New York, NY 10002 and social security number is ▓▓▓▓▓▓▓▓▓. The Defendant's address is ▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓ , and social security number is _Unknown_____.

15      Now on motion of _FANG, Xiu Xiang_____, the ☐ *attorney for Plaintiff* **OR** ☑ *Plaintiff*, it is:

16      **ORDERED AND ADJUDGED** that the Referee's Report, if any, is hereby confirmed; and it is further

17      **ORDERED, ADJUDGED AND DECREED** that the marriage between _FANG, Xiu Xiang_____, plaintiff, and _LIN, Zhao Xiang_____, defendant, is hereby dissolved by reason of:

☐  (a)  the cruel and inhuman treatment of ☐ *Plaintiff by Defendant* **OR** ☐ *Defendant by Plaintiff* pursuant to D.R.L. §170(1); and/or

☐  (b)  the abandonment of ☐ *Plaintiff* **OR** ☐ *Defendant* by ☐ *Plaintiff* **OR** ☐ *Defendant*, for a period of one or more years, pursuant to D.R.L. §170(2); and/or

(Form UD-11 - Rev. 10/10)

☐   (c)   the confinement of ☐ *Plaintiff* **OR** ☐ *Defendant* in prison for a period of three or more consecutive years after the marriage of Plaintiff and Defendant, pursuant to D.R.L. §170(3); and/or

☐   (d)   the commission of an act of adultery by ☐ *Plaintiff* **OR** ☐ *Defendant,* pursuant to D.R.L. §170(4); and/or

☐   (e)   the parties having lived separate and apart pursuant to a decree or judgment of separation dated _____ for a period of one or more years after the granting of such decree or judgment, pursuant to D.R.L. §170(5); and/or

☐   (f)   the parties having lived separate and apart pursuant to a Separation Agreement dated ___ _____ in compliance with the provisions of D.R.L. §170(6); and/or

☑   (g)   the relationship between Plaintiff and Defendant has broken down irretrievably for a period of at least six months pursuant to D.R.L. §170(7) and ☑ Plaintiff has so stated under oath and/or☐ Defendant has so stated under oath; and

*18*     **The requirements of D.R.L. §240 1(a-1)(1) have been met and the Court having considered the results of said inquiries, it is**

**ORDERED AND ADJUDGED** that ☑ *Plaintiff* **OR** ☐ *Defendant* **OR** ☐ *third party,* *namely:* _____ shall have custody of the minor child(ren) of the marriage, i.e.:

*19*

| Name | Date of Birth | Social Security No. |
|---|---|---|
| LONG HUI LIN | ~~30/31/1955~~ | ~~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~~ |
| | | |
| | | |
| | | |

**OR** ☐ *There are no minor children of the marriage*; and

20        The requirements of D.R.L. §240 1 (a-1) (1) have been met and the Court having considered the results of said inquires, it is

**ORDERED AND ADJUDGED** that ☐ *Plaintiff* **OR** ☑ *Defendant* shall have visitation with the minor child(ren) of the marriage ☐ *in accordance with the parties' settlement agreement* **OR** ☑ *according to the following schedule*: at any time. _____

_____

_____

_____

_____ ;        **OR** ☐ *Visitation is not applicable*; and it is further;

21        **ORDERED AND ADJUDGED** that the existing _____ County, _____ Court order(s) under ☐ *Index No.._____* **OR** ☐ *Docket No._____* as to ☐ *custody* **OR** ☐ *visitation* **OR** ☐ *maintenance* shall continue, and a copy of this judgment shall be served by ☐ *Plaintiff* **OR** ☐ *Defendant* upon the Clerk of the _____ County _____ Court within _____ days of its entry;

**OR** ☑ *There are no court orders with regard to custody, visitation or maintenance to be continued*; and it is further

22        **ORDERED AND ADJUDGED** that ☐ *Plaintiff* **OR** ☐ *Defendant* shall pay to ☐ *Plaintiff* **OR** ☐ *Defendant* **OR** ☐ *third party, namely:_____*, as and for the support of the parties' unemancipated children of the marriage, the sum of $____ _____ per_____, pursuant to an existing order issued by the _____ County, _____ Court, under ☐ *Index* **OR** ☐ *Docket* Number _____, the terms of which are hereby continued. ☐ *Plaintiff* **OR** ☐ *Defendant* shall serve a copy of this Judgment upon the Clerk of the _____ County, _____ Court within _____ days of its entry; **OR** ☑ *There are no orders from other courts to be continued*; and it is further

23        **ORDERED AND ADJUDGED** that :

**A)**      ☐ Pursuant to the ☐ *agreement of the parties*          the ☐ *Plaintiff* shall pay
                                ☐ *Court's decision*                    ☐ *Defendant*

to ☐ *Plaintiff*   the sum of $_____   ☐ *per week*          as and for maintenance:
   ☐ *Defendant*                            ☐ *bi-weekly*
                                            ☐ *per month*
                                            ☐

☐ *payments to be made as set forth in the agreement;*

☐ *commencing on the ____ day of _____, ____, and continuing until the ____ day of*
_____, ____.                                        *month*     *year*

Payment shall be ☐ *a direct payment,*
                 ☐ *by an Income Deduction Order issued simultaneously herewith;*

==============================**OR**==============================

**B)**      ☐ *that there is no award of maintenance per the court's decision;*
            ☑ *that there is no request for maintenance;*
        and it is further;

24        **ORDERED AND ADJUDGED** that ☐ *Plaintiff*  **OR**  ☑ *Defendant*   shall pay
to ☑ *Plaintiff*  **OR** ☐ *Defendant*  **OR** ☐ *third party, namely:* _____, as and for
the support of the parties' unemancipated child(Ren) of the marriage, namely:

| Name | Date of Birth |
|------|---------------|
| LONG HUI LIN | ~~██████████~~ |
| | |
| | |
| | |

the sum of $25_____ ☐ *per week*  **OR**  ☐ *bi-weekly*  **OR**  ☑ *per month,* commencing on
_____, and to be paid ☑ *directly to* ☑ *Plaintiff*  **OR** ☐ *Defendant*  **OR** ☐
*third party, namely:*_____,   **OR** ☐ *through the* _____ *County*
*Support Collection Unit located at* _____
, together with such dollar amounts or percentages for☐ *child care*  **OR** ☐ *education*  **OR** ☐
*health care*  as set forth below in accordance with ☑ *the Court's decision*  **OR** ☐ *the parties'*
*Settlement Agreement.* Such Agreement is in compliance with D.R.L. §240(1-b)(h) because:

The parties have been advised of the provisions of D.R.L. Sec. 240(1-b); the unrepresented party, if any, has received a copy of the Child Support Standards Chart promulgated by the Commissioner of Social Services pursuant to Social Services Law Sec. 111-I;

the basic child support obligation, as defined in D.R.L. Sec. 240(1-b), presumptively results in the correct amount of child support to be awarded, and the agreed upon amount substantially conforms to the basic support obligation attributable to the non-custodial parent;

the amount awarded is neither unjust nor inappropriate, and the Court has approved such award through the Findings of Fact and Conclusions of Law;

**OR**

The basic support obligation, as defined in DRL Sec. 240 (1-b), presumptively results in the correct amount of child support to be awarded, and the amount attributable to the non-custodial parent is

$_____ per _____;

the amount of child support agreed to in this action deviates from the amount attributable to the non-custodial parent, and the Court has approved of such agreed-upon amount based upon the reasons set forth in the Findings of Fact and Conclusions of Law, which are incorporated herein by reference; and it is further

**OR**  ☐  *This provision is not applicable*

25  **ORDERED AND ADJUDGED** that ☐ *Plaintiff* **OR** ☐ *Defendant* shall pay to ☐ *Plaintiff* **OR** ☐ *Defendant* **OR** ☐ *third party, namely:* _____ as and for child care expenses, pursuant to ☐ written agreement of the parties **OR** ☐ the court's decision.

**OR** ☑ *Not applicable*; and it is further

26  **ORDERED AND ADJUDGED** that ☐ *Plaintiff* **OR** ☐ *Defendant* shall pay to ☐ *Plaintiff* **OR** ☐ *Defendant* **OR** ☐ *third party, namely:* _____ as and for future reasonable health expenses, pursuant to ☐ written agreement of the parties **OR** ☐ the court's decision

**OR** ☑ *Not applicable*; and it is further

(Form UD-11 - Rev. 10/10)

**ORDERED AND ADJUDGED** that ☑ *Plaintiff* **OR** ☐ *Defendant* shall apply to the state sponsored health insurance plan for coverage for the unemancipated children of the marriage. The costs shall be allocated pursuant to ☐written agreement of the parties **OR**☑the court's decision **OR** ☐ *Not applicable*; and it is further

27 **ORDERED AND ADJUDGED** that ☐ *Plaintiff* **OR** ☐ *Defendant* shall pay to ☐ *Plaintiff* **OR** ☐ *Defendant* **OR** ☐*third party, namely:* _____☐education expenses of the children pursuant to ☐ written agreement of the parties **OR** ☐ the court's decision **OR** ☑ *Not applicable*; and it is further

28 **ORDERED AND ADJUDGED** that ☐ *Plaintiff* **OR** ☐ *Defendant* is hereby awarded

exclusive occupancy of the marital residence located at_____

_____, together with its contents until further order of the court, **OR** ☐ as

follows: _____

_____; **OR** ☑ *Not*

*applicable*; and it is further

29 **ORDERED AND ADJUDGED** that the Settlement Agreement entered into between the

parties on the_____day of_____, ☐ *an original* **OR** ☐*a transcript* of which

is on file with this Court and incorporated herein by reference, shall survive and shall not be

merged into this judgment, and the parties are hereby directed to comply with all legally

enforceable terms and conditions of said agreement as if such terms and conditions were set forth

in their entirety herein, and this Court retains jurisdiction of this matter concurrently with the

Family Court for the purposes of specifically enforcing such of the provisions of said Agreement

as are capable of specific enforcement to the extent permitted

by law with regard to maintenance, child support, custody and/or visitation, and of making

such further judgment as it finds appropriate under the circumstances existing at the time

application for that purpose is made to it, or both; and it is further

(Form UD-11 - Rev. 10/10)

*30*       **ORDERED AND ADJUDGED** that a separate Qualified Medical Child Support Order shall be issued simultaneously herewith  **OR** ☑ Not applicable; and it is further

*31*       **ORDERED AND ADJUDGED** that, pursuant to the ☐ *parties' Settlement Agreement* **OR** ☐ *the court's decision*, a separate Qualified Domestic Relations Order shall be     issued simultaneously herewith or as soon as practicable **OR** ☑ *Not applicable*; and it is further

*32*       **ORDERED AND ADJUDGED** that, ☐ *pursuant to the Court's decision* **OR** ☐ *pursuant to the parties' agreement,* the Court shall issue an income deduction order simultaneously herewith **OR** ☑ *Not applicable*; and it is further

*33*       **ORDERED AND ADJUDGED** that both parties are authorized to resume the use of any prior surname, and it is further

*34*       **ORDERED AND ADJUDGED** that ☑ *Plaintiff* **OR** ☐ *Defendant* is authorized to resume use of the prior surname FANG     .

*35*       **ORDERED AND ADJUDGED** that ☐ *Plaintiff* **OR** ☐ *Defendant* is hereby awarded counsel and/or expert's fees as follows:

_____

_____ **OR** ☑ *Not applicable*; and it is further

36       **ORDERED AND ADJUDGED** that ☐ *Plaintiff* **OR** ☑ *Defendant* shall

be served with a copy of this judgment, with notice of entry, by the ☑ *Plaintiff* **OR** ☐

*Defendant*, within ___20___ days of such entry.

37     Dated: Feb. 22, 2012

               ENTER:

                                       J.S.C. *Referee*
                                    **DEBORAH A. KAPLAN**
                                           J.S.C.

STATE OF NEW YORK COUNTY OF NEW YORK,
SS: I, NORMAN GOODMAN, COUNTY CLERK AND
CLERK OF THE SUPREME COURT, NEW YORK
COUNTY, DO HEREBY CERTIFY ON

2012 APR 20   A  9: 02

THAT I HAVE COMPARED THIS COPY
WITH THE ORIGINAL FILED IN MY OFFICE ON

4/11/12

AND THAT THE SAME IS A CORRECT

(Form UD-11 - Rev. 10/10)

TRANSCRIPT THEREFROM AND OF THE
WHOLE OF SUCH ORIGINAL. IN WITNESS
WHEREOF, I HAVE HEREUNTO SET MY
HAND AND AFFIXED MY OFFICIAL SEAL.

**FILED**

450737

APR 1 1 2012

**COUNTY CLERK'S OFFICE
NEW YORK**

COUNTY CLERK AND CLERK OF THE
SUPREME COURT, NEW YORK COUNTY
FACSIMILE SIGNATURE USED PURSUANT
TO SEC. 927-A... PER FEE PAID

**FILED**

APR 11 2012

AT 2:40 P M

N.Y., CO. CLK'S OFFICE

Judgment

Order

315 292/11

HAIOU DUAN MEDICAL P.C.
5314 7TH AVE, 2ND FLOOR
BROOKLYN, NY 11220-2599
Tel: 347-689-9112 Fax: 347-689-2703

To whom it may concern:

Patient Name: Wen Wen Chen, DOB: ~~██████~~ had a positive urine pregnancy test at our clinic on 04/19/2021. She is approximately _6_ weeks and _0_ days, with an expected due date on _12/13/2021_.

If you have any questions, please contact 347-689-9112 for additional information. Thanks!

Sincerely,

HAIOU DUAN MEDICAL P.C.
5314 7th Avenue, 2nd Floor
Brooklyn, NY 11220
Tel: 347-689-9112

Haiou Duan M.D.

**Eric Zhou** *Medical Office PC*

98 East Broadway
Floor 4
New York, NY 10002
Tel: (212) 966-2699
Fax: (212) 966-1206

# Eric Zhou, MD

*Board certified in Internal medicine &Nephrology*

Jan 27, 2021

Re: Fang, Xiu Xiang (~~DOB: 09/03/1954~~)

To whom it may concern,

Ms. Fang has been seen in our office since 06/24/2010, I am her primary care physician. She complains chronic lower back pain with sciatica, neck pain and shoulder pain.    According to patient, she had history of lumbar disc herniation.

If you have any questions, please feel free to contact me.

Sincerely,

Eric Zhou, MD

Eric Zhou, MD, PhD
98 E Broadway 4th Floor
New York, NY 10002
Tel 212-966-2699

EXHIBIT 2(A-B)

# 1040

Department of the Treasury—Internal Revenue Service (99)
**U.S. Individual Income Tax Return**

**2020**  OMB No. 1545-0074  IRS Use Only—Do not write or staple in this space.

**Filing Status**
Check only
one box.

[X] Single  [ ] Married filing jointly  [ ] Married filing separately (MFS)  [ ] Head of household (HOH)  [ ] Qualifying widow(er) (QW)

If you checked the MFS box, enter the name of your spouse. If you checked the HOH or QW box, enter the child's name if the qualifying person is
a child but not your dependent ▶

| Your first name and middle initial | Last name | Your social security number |
|---|---|---|
| ONGHUI | LIN | ▋▋▋▋▋▋▋ |
| If joint return, spouse's first name and middle initial | Last name | Spouse's social security number |

Home address (number and street). If you have a P.O. box, see instructions. | Apt. no.
439 BAY RIDGE PKWY

| City, town, or post office. If you have a foreign address, also complete spaces below. | State | ZIP code |
|---|---|---|
| Brooklyn | NY | 11228 |

Foreign country name | Foreign province/state/county | Foreign postal code

**Presidential Election Campaign**
Check here if you, or your
spouse if filing jointly, want $3
to go to this fund. Checking a
box below will not change
your tax or refund.
[ ] You  [ ] Spouse

At any time during 2020, did you receive, sell, send, exchange, or otherwise acquire any financial interest in any virtual currency?  [ ] Yes  [X] No

**Standard Deduction**
Someone can claim:  [ ] You as a dependent  [ ] Your spouse as a dependent
[ ] Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness**  You:  [ ] Were born before January 2, 1956  [ ] Are blind  **Spouse:**  [ ] Was born before January 2, 1956  [ ] Is blind

**Dependents** (see instructions):

| (1) First name     Last name | (2) Social security number | (3) Relationship to you | (4) ✓ if qualifies for (see instructions): Child tax credit | Credit for other dependen |
|---|---|---|---|---|
| | | | [ ] | [ ] |
| | | | [ ] | [ ] |
| | | | [ ] | [ ] |
| | | | [ ] | [ ] |

If more
than four
dependents,
see instructions
and check
here ▶ [ ]

| | | | | |
|---|---|---|---|---|
| **1** | Wages, salaries, tips, etc. Attach Form(s) W-2 . . . . . . . . . . . . . . . . . . . | | **1** | 12,02 |
| **2a** | Tax-exempt interest . . . . . . | **2a** | **b** Taxable interest . . . . . . . . . . . . . . | **2b** | |
| **3a** | Qualified dividends . . . . . . | **3a** | **b** Ordinary dividends. . . . . . . . . . . . . | **3b** | |
| **4a** | IRA distributions . . . . . . . . | **4a** | **b** Taxable amount . . . . . . . . . . . . . . | **4b** | |
| **5a** | Pensions and annuities . . . . . | **5a** | **b** Taxable amount . . . . . . . . . . . . . . | **5b** | |
| **6a** | Social security benefits . . . . | **6a** | **b** Taxable amount . . . . . . . . . . . . . ▶ | **6b** | |
| **7** | Capital gain or (loss). Attach Schedule D if required. If not required, check here . . . . . . . . . . . ▶ [ ] | | **7** | |
| **8** | Other income from Schedule 1, line 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . | **8** | |
| **9** | Add lines 1, 2b, 3b, 4b, 5b, 6b, 7, and 8. This is your **total income** . . . . . . . . . . . . . . ▶ | **9** | 12,02 |
| **10** | Adjustments to income: | | | |
| **a** | From Schedule 1, line 22 . . . . . . . . . . . . . . . . . . . . . | **10a** | | |
| **b** | Charitable contributions if you take the standard deduction. See instructions | **10b** | | |
| **c** | Add lines 10a and 10b. These are your **total adjustments to income** . . . . . . . . . . . . . . . . ▶ | **10c** | |
| **11** | Subtract line 10c from line 9. This is your **adjusted gross income** . . . . . . . . . . . . . . . . ▶ | **11** | 12,02 |
| **12** | Standard deduction or itemized deductions (from Schedule A) . . . . . . . . . . . . . . . . . . | **12** | 12,40 |
| **13** | Qualified business income deduction. Attach Form 8995 or Form 8995-A . . . . . . . . . . . . | **13** | |
| **14** | Add lines 12 and 13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **14** | 12,40 |
| **15** | **Taxable income.** Subtract line 14 from line 11. If zero or less, enter -0- . . . . . . . . . . . . . . | **15** | |

Attach
Sch. B if
required.

Standard
Deduction for—

Single or Married
filing separately,
$12,400

Married filing
jointly or Qualifying
widow(er),
$24,800

Head of
household,
$18,650

If you checked
any box under
*Standard
Deduction,*
see instructions.

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.

ITA

Form **1040** (202

Form 1040 (2020)   LONGHUI LIN   Page

| | | 16 | |
|---|---|---|---|
| 16 | Tax (see instructions). Check if any from Form(s):  1 ☐ 8814  2 ☐ 4972  3 ☐ _____ | 16 | |
| 17 | Amount from Schedule 2, line 3 . . . . . . . . . . . . . . . . . . . . . | 17 | |
| 18 | Add lines 16 and 17 . . . . . . . . . . . . . . . . . . . . . . . . . | 18 | |
| 19 | Child tax credit or credit for other dependents . . . . . . . . . . . . . . . . | 19 | |
| 20 | Amount from Schedule 3, line 7 . . . . . . . . . . . . . . . . . . . . | 20 | |
| 21 | Add lines 19 and 20 . . . . . . . . . . . . . . . . . . . . . . . . . | 21 | |
| 22 | Subtract line 21 from line 18. If zero or less, enter -0- . . . . . . . . . . . . . | 22 | |
| 23 | Other taxes, including self-employment tax, from Schedule 2, line 10 . . . . . . . . | 23 | |
| 24 | Add lines 22 and 23. This is your **total tax** . . . . . . . . . . . . . . ▶ | 24 | |

| | | | | 25 | |
|---|---|---|---|---|---|
| 25 | Federal income tax withheld from: | | | | |
| a | Form(s) W-2 . . . . . . . . . . . . . . . . | 25a | | | |
| b | Form(s) 1099 . . . . . . . . . . . . . . . | 25b | | | |
| c | Other forms (see instructions) . . . . . . . . . . | 25c | | | |
| d | Add lines 25a through 25c . . . . . . . . . . . . . . . . . . . . . | | 25d | |

• If you have a qualifying child, attach Sch. EIC.

• If you have nontaxable combat pay, see instructions.

| | | | | | |
|---|---|---|---|---|---|
| 26 | 2020 estimated tax payments and amount applied from 2019 return . . . . . . . . | | 26 | |
| 27 | Earned income credit (EIC) . . . . . . . . . . . . . | 27 | 290 | |
| 28 | Additional child tax credit. Attach Schedule 8812 . . . . . . | 28 | | |
| 29 | American opportunity credit from Form 8863, line 8 . . . . . | 29 | | |
| 30 | Recovery rebate credit. See instructions . . . . . . . . | 30 | | |
| 31 | Amount from Schedule 3, line 13 . . . . . . . . . . . | 31 | | |
| 32 | Add lines 27 through 31. These are your **total other payments and refundable credits** . . . ▶ | | 32 | 29 |
| 33 | Add lines 25d, 26, and 32. These are your **total payments** . . . . . . . . ▶ | | 33 | 29 |

**Refund**

Direct deposit?
See instructions.

| | | | | 34 | 29 |
|---|---|---|---|---|---|
| 34 | If line 33 is more than line 24, subtract line 24 from line 33. This is the amount you **overpaid** . . . . | | 34 | 29 |
| 35a | Amount of line 34 you want **refunded to you.** If Form 8888 is attached, check here . . . . ▶ ☐ | | 35a | 29 |
| ▶ b | Routing number [_____] ▶ c Type: ☒ Checking ☐ Savings | | | |
| ▶ d | Account number [_____] | | | |
| 36 | Amount of line 34 you want **applied to your 2021 estimated tax** . . . . ▶ | 36 | | |

**Amount You Owe**

For details on how to pay, see instructions.

| | | | | 37 | |
|---|---|---|---|---|---|
| 37 | Subtract line 33 from line 24. This is the **amount you owe** . . . . . . . . . . ▶ | | 37 | |
| | **Note:** Schedule H and Schedule SE filers, line 37 may not represent all of the taxes you owe for 2020. See Schedule 3, line 12e, and its instructions for details. | | | |
| 38 | Estimated tax penalty (see instructions) . . . . . . . . . . . ▶ | 38 | | |

**Third Party Designee**

Do you want to allow another person to discuss this return with the IRS?
See instructions . . . . . . . . . . . . . . . . . . . . . . . . ▶  ☐ **Yes. Complete below.**  ☒ **No**

Designee's name ▶ _____

Phone no. ▶ _____

Personal identification number (PIN) ▶ _____

**Sign Here**

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Joint return?
See instructions.
Keep a copy for your records.

| Your signature | Date | Your occupation | If the IRS sent you an Identity Protection PIN, enter it here (see inst.) ▶ |
|---|---|---|---|
| Spouse's signature. If a joint return, **both** must sign. | Date | Spouse's occupation | If the IRS sent you an Identity Protection PIN, enter it here (see inst.) ▶ |

Phone no. (646) 829-5006   Email address

**Paid Preparer Use Only**

| Preparer's name | Preparer's signature | Date | PTIN | Check if: |
|---|---|---|---|---|
| ~~DR. FATH~~ | ~~DR. FATH~~ | 3/29/2021 | P00369902~~ | ☐ Self-employed |
| Firm's name ▶ ~~ALPHA TAX AND ACCOUNTING SERVICES~~ | | | Phone no. (212) 518-0280 | |
| Firm's address ▶ ~~8 CHATHAM SQ, STE 702, NEW YORK, NY 10038~~ | | | Firm's EIN ▶ ~~XX-XXXXXXX~~ | |

Go to *www.irs.gov/Form1040* for instructions and the latest information.

Form **1040** (2020)

## Copy C—For EMPLOYEE'S RECORDS (See Notice to Employee

OMB No. 1545-0008

| | |
|---|---|
| Employee's soc. sec. no. | 1 Wages, tips, other comp. 12025.00 | 2 Federal income tax withheld |
| Employer ID number (EIN) | 3 Social security wages 12025.00 | 4 Social security tax withheld 745.55 |
| | 5 Medicare wages and tips 12025.00 | 6 Medicare tax withheld 174.33 |

Employer's name, address, and ZIP code

MAIN MOON BUFFET CENTRAL INC

40 CENTRAL PLZ
ILION NY 13357

Control number
6

Employee's name, address, and ZIP code

LONG HUI LIN

NY 13357

| 7 Social security tips | 8 Allocated tips | 9 |
|---|---|---|
| 10 Dependent care benefits | 11 Nonqualified plans | 12a Code See inst. for box 12 |
| 13 Statutory employee  14 Other | | 12b Code |
| Retirement plan | | 12c Code |
| Third-party sick pay | | 12d Code |

| 15 State Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax |
|---|---|---|
| NY 12025.00 | 12025.00 | 232.40 |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form W-2 Wage and Tax Statement   2020   Dept. of the Treasury - IRS

This information is being furnished to the IRS. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

---

## Copy 2—To Be Filed With Employee's State, City or Local Income Tax Return

OMB No. 1545-0008

| | |
|---|---|
| a Employee's soc. sec. no. | 1 Wages, tips, other comp. 12025.00 | 2 Federal income tax withheld |
| b Employer ID number (EIN) | 3 Social security wages 12025.00 | 4 Social security tax withheld 745.55 |
| | 5 Medicare wages and tips 12025.00 | 6 Medicare tax withheld 174.33 |

c Employer's name, address, and ZIP code

MAIN MOON BUFFET CENTRAL INC

40 CENTRAL PLZ
ILION NY 13357

d Control number
16

e Employee's name, address, and ZIP code

LONG HUI LIN

NY 13357

| 7 Social security tips | 8 Allocated tips | 9 |
|---|---|---|
| 10 Dependent care benefits | 11 Nonqualified plans | 12a Code |
| 13 Statutory employee  14 Other | | 12b Code |
| Retirement plan | | 12c Code |
| Third-party sick pay | | 12d Code |

| 15 State Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax |
|---|---|---|
| NY 12025.00 | 12025.00 | 232.40 |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form W-2 Wage and Tax Statement   2020   Dept. of the Treasury -

BW24UP   NTF 2583856   0   BW24UP

# 1040

Department of the Treasury—Internal Revenue Service    (99)
**U.S. Individual Income Tax Return**    2019    OMB No. 1545-0074    IRS Use Only—Do not write or staple in this space.

**Filing Status**
Check only one box.
[X] Single  [ ] Married filing jointly  [ ] Married filing separately (MFS)  [ ] Head of household (HOH)  [ ] Qualifying widow(er) (QW)

If you checked the MFS box, enter the name of spouse. If you checked the HOH or QW box, enter the child's name if the qualifying person is a child but not your dependent. ▶

| Your first name and middle initial | Last name | Your social security number |
|---|---|---|
| ONGHUI | LIN | 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 |
| If joint return, spouse's first name and middle initial | Last name | Spouse's social security number |

Home address (number and street). If you have a P.O. box, see instructions.    Apt. no.
47 BROOME STREET    C4

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below (see instructions).
NY    10002
New York

Foreign country name    Foreign province/state/county    Foreign postal code

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund.   [ ] You   [ ] Spouse

If more than four dependents, see instructions and ✓ here ▶

**Standard Deduction**
Someone can claim:  [ ] You as a dependent   [ ] Your spouse as a dependent
[ ] Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness**  You: [ ] Were born before January 2, 1955  [ ] Are blind   Spouse: [ ] Was born before January 2, 1955  [ ] Is blind

**Dependents** (see instructions):

| (1) First name    Last name | (2) Social security number | (3) Relationship to you | (4) ✓ if qualifies for (see instructions): |  |
|---|---|---|---|---|
|  |  |  | Child tax credit | Credit for other dependents |
|  |  |  | [ ] | [ ] |
|  |  |  | [ ] | [ ] |
|  |  |  | [ ] | [ ] |
|  |  |  | [ ] | [ ] |

| | | | | | |
|---|---|---|---|---|---|
| 1 | Wages, salaries, tips, etc. Attach Form(s) W-2 . . . . . . . . . . . . | | | 1 | 23,04 |
| 2a | Tax-exempt interest . . . . | 2a | | b Taxable interest. Attach Sch. B if required . . | 2b | |
| 3a | Qualified dividends . . . . . | 3a | | b Ordinary dividends. Attach Sch. B if required . . | 3b | |
| 4a | IRA distributions . . . . . . . | 4a | | b Taxable amount . . . . . . . . . . . . | 4b | |
| c | Pensions and annuities . . . . | 4c | | d Taxable amount . . . . . . . . . . . | 4d | |
| 5a | Social security benefits . . . . | 5a | | b Taxable amount . . . . . . . | 5b | |
| 6 | Capital gain or (loss). Attach Schedule D if required. If not required, check here . . . . ▶ [ ] | | | 6 | |
| 7a | Other income from Schedule 1, line 9 . . . . . . . . . . . . . . . . . . | | | 7a | |
| b | Add lines 1, 2b, 3b, 4b, 4d, 5b, 6, and 7a. This is your **total income** . . . . . . . . ▶ | | | 7b | 23,04 |
| 8a | Adjustments to income from Schedule 1, line 22 . . . . . . . . . . . . . . | | | 8a | |
| b | Subtract line 8a from line 7b. This is your **adjusted gross income** . . . . . . . . ▶ | | | 8b | 23,04 |
| 9 | Standard deduction or itemized deductions (from Schedule A) . . . | 9 | 12,200 | | |
| 10 | Qualified business income deduction. Attach Form 8995 or Form 8995-A . . . . . . | 10 | | | |
| 11a | Add lines 9 and 10 . . . . . . . . . . . . . . . . . . . . . . . . . | | | 11a | 12,20 |
| b | **Taxable income.** Subtract line 11a from line 8b. If zero or less, enter -0- . . . . . . | | | 11b | 10,84 |

**Standard Deduction for—**
Single or Married filing separately, $12,200
Married filing jointly or Qualifying widow(er), $24,400
Head of household, $18,350
If you checked any box under Standard Deduction, see instructions.

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.    Form **1040** (20
ITA

orm 1040 (2019)   LONGHUI LIN                                                              Page **2**

| | | | | | |
|---|---|---|---|---|---|
| **12a** | Tax (see inst.) Check if any from Form(s): 1 ☐ 8814  2 ☐ 4972 3 ☐ | | **12a** | | 1,105 |
| **b** | Add Schedule 2, line 3, and line 12a and enter the total . . . . . . . . . . . . . ▶ | | | **12b** | 1,105 |
| **13a** | Child tax credit or credit for other dependents . . . . . . . . . . . . . . . | | **13a** | | |
| **b** | Add Schedule 3, line 7, and line 13a and enter the total . . . . . . . . . . . ▶ | | | **13b** | |
| **14** | Subtract line 13b from line 12b. If zero or less, enter -0- . . . . . . . . . . . . | | | **14** | 1,105 |
| **15** | Other taxes, including self-employment tax, from Schedule 2, line 10 . . . . . . . . | | | **15** | |
| **16** | Add lines 14 and 15. This is your **total tax** . . . . . . . . . . . . . . . ▶ | | | **16** | 1,105 |
| **17** | Federal income tax withheld from Forms W-2 and 1099 . . . . . . . . . . . . | | | **17** | |
| **18** | Other payments and refundable credits: | | | | |
| **a** | Earned income credit (EIC) . . . . . . . . . . . . . | | **18a** | | |
| **b** | Additional child tax credit. Attach Schedule 8812 . . . . . | | **18b** | | |
| **c** | American opportunity credit from Form 8863, line 8 . . . . | | **18c** | | |
| **d** | Schedule 3, line 14 . . . . . . . . . . . . . . . . | | **18d** | | |
| **e** | Add lines 18a through 18d. These are your **total other payments and refundable credits** . . . . ▶ | | | **18e** | ( |
| **19** | Add lines 17 and 18e. These are your **total payments** . . . . . . . . . . . . . . ▶ | | | **19** | ( |
| **20** | If line 19 is more than line 16, subtract line 16 from line 19. This is the amount you **overpaid** . . . . . . ▶ | | | **20** | |
| **21a** | Amount of line 20 you want **refunded to you.** If Form 8888 is attached, check here . . . . ▶ ☐ | | | **21a** | |
| ▶ **c** Type: ☐ Checking  ☐ Savings | | | | | |
| ▶ **b** Routing number | | | | | |
| ▶ **d** Account number | | | | | |
| **22** | Amount of line 20 you want applied to your 2020 estimated tax . . . . . . ▶ | | **22** | | |
| **23** | **Amount you owe.** Subtract line 19 from line 16. For details on how to pay, see instructions . . . ▶ | | | **23** | 1,13 |
| **24** | Estimated tax penalty (see instructions) . . . . . . . . . . . . . . ▶ | | **24** | 34 | |

If you have a qualifying child, attach Sch. EIC.

If you have nontaxable combat pay, see instructions.

**Refund**
Direct deposit?
See instructions.

**Amount You Owe**

**Third Party Designee**
(Other than paid preparer)

Do you want to allow another person (other than your paid preparer) to discuss this return with the IRS? See instructions.    ☐ **Yes. Complete below.**   ☒ **No**

| Designee's name ▶ | Phone no. ▶ | Personal identification number (PIN) ▶ |
|---|---|---|

**Sign Here**
Joint return?
See instructions.
Keep a copy for your records.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Your signature | Date | Your occupation | If the IRS sent you an Identity Protection PIN, enter it here (see inst.) |
|---|---|---|---|
| Spouse's signature. If a joint return, **both** must sign. | Date | Spouse's occupation | If the IRS sent you an Identity Protection PIN, enter it here (see inst.) |

Phone no. (646) 829-5006    Email address

**Paid Preparer Use Only**

| Preparer's name | Preparer's signature | Date | PTIN | Check if: |
|---|---|---|---|---|
| DE FALIS | DE FALIS | 3/31/2020 | P00368999 | ☐ 3rd Party Designee |
| Firm's name ▶ DELPHIA TAX AND ACCOUNTING SERVICES | | Phone no. (212)-518-9399 | | ☐ Self-employed |
| Firm's address ▶ 8 CHATHAM SQ. STE #02 NEW YORK, NY 10038 | | | Firm's EIN ▶ 73-1675842 | |

Go to *www.irs.gov/Form1040* for instructions and the latest information.

Form **1040** (201

| a Employee's SSN | | b Employer identification number (EIN) | | | OMB No. 1545-0008 | |
|---|---|---|---|---|---|---|
| c Employer's name, address, and ZIP code | | This information is being furnished to the IRS. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it. | | | | |
| 42-44 EAST BROADWAY RESTAURANT IN | | **1** Wgs, tips, other compn 23045.46 | **2** Fed inc tax withheld | **3** Social security wages 10158.08 | Form **W-2** | |
| 42-44 EAST BROADWAY | | **4** SS tax withheld 1428.82 | **5** Medicare wages & tips 23045.46 | **6** Medicare tax withheld 334.16 | **Wage and Tax** | |
| NEW YORK          NY 10002 | | **7** Social security tips 12887.38 | **8** Allocated tips | **9** | **Statement** | |
| **d** Control No. | | **10** Depdnt care benefits | **11** Nonqualified plans | **12a** | **2019** | |
| **e** Employee's name, address, and ZIP code            Suff. | | **13** | **14** Other | **12b** | | |
| | | Statutory employee. ☐ | NY-SDI  15.00 | | **Copy C For** | |
| LONGHUI       LIN | | | NY-FLI  35.26 | **12c** | **EMPLOYEE'S RECORDS.** | |
| 420 64TH ST APT 11D | | Retirement plan · · ☐ | | | **(See Notice to** | |
| BROOKLYN        NY 11220 | | | | **12d** | **Employee.)** | |
| | | Third-party sick pay ☐ | | | | |
| **15** State | Employer's state ID No. | **16** State wages, tips, etc | **17** State income tax | **18** Local wages, tips, etc . | **19** Local income tax | **20** Locality name |
| NY | | 23045.46 | | 23045.46 | 0.00 | NY - Ci |

REV 12/23/19 QBDT

 TransUnion.

## Personal Credit Report for Long Hui Lin

Report Date: 04/05/2021
Source: TransUnion

**File Number:**

### Personal Information

You have been on our files since 08/07/2016

SSN
: Your SSN has been masked
for your protection.

Date of Birth:

**Names Reported:** LONGHUI LIN, LONG HUI LIN and LIN LONGHUI

#### Addresses Reported:

| Address | Date Reported |
|---|---|
| 420 64TH ST APT 11D, BROOKLYN, NY 11220-4975 | 01/05/2017 |
| 1228 78TH ST APT 1, BROOKLYN, NY 11228-2738 | 11/30/2020 |
| 1223 78TH ST APT 5, BROOKLYN, NY 11228-2717 | 09/15/2020 |
| 1223 78TH ST APT 1FT, BROOKLYN, NY 11228-2717 | 08/16/2020 |
| 916 57TH ST APT 3A, BROOKLYN, NY 11219-4417 | 08/19/2019 |
| 13105 40TH RD APT 117Q, FLUSHING, NY 11354-5188 | 01/15/2018 |
| 13105 40TH RD APT 17Q, FLUSHING, NY 11354-5200 | 12/06/2017 |
| 934 59TH ST APT 1F, BROOKLYN, NY 11219-4809 | 11/30/2016 |
| 628 68TH ST, BROOKLYN, NY 11220-5510 | 08/07/2016 |

#### Telephone Numbers Reported:

(646) 379-7268   (917) 488-1888   (646) 510-5616

#### Employment Data Reported:

### Account Information

Typically, creditors report any changes made to your account information monthly. This means that some accounts listed below may not
reflect the most recent activity until the creditor's next reporting. This information may include things such as

**Rating Key**
Some creditors report the timeliness of your payments each month in relation to your agreement with them. The ratings in the key below describe the payments that may be reported by your creditors. Please note: Some but not all of these ratings may be present in your credit report.

| N/R | X | OK | 30 | 60 | 90 | 120 | COL | VS | RPO | C/O | FC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Not Reported | Unknown | Current | 30 days late | 60 days late | 90 days late | 120+ days late | Collection | Voluntary Surrender | Repossession | Charge Off | Foreclosure |

### Adverse Accounts

Adverse information typically remains on your credit file for up to 7 years from the date of the delinquency. To help you understand what is generally considered adverse, we have added >brackets< to those items in this report. For your protection, your account numbers have been partially masked, and in some cases scrambled. Please note: Accounts are reported as "Current; Paid or paying as agreed" if paid within 30 days of the due date. Accounts reported as Current may still incur late fees or interest charges if not paid on or before the due date.

#### STATE FARM BANK 85464483650****

PO Box 2313
Bloomington, IL 61702
(877) 734-2265

| Date Opened: | 11/29/2016 | Date Updated: | 07/05/2019 | Pay Status: Current Account |
| Responsibility: | Joint Account | Payment | $0 | Terms: $0 per month, paid |
| Account Type: | Installment | Last Payment | 06/13/2019 | Monthly for 60 months |
| | Account | Made: | | Date 07/05/2019 |
| Loan Type: | AUTOMOBILE | | | Closed >Maximum Delinquency of 30 days |
| | | | | in 02/2017 for $887< |

**High Balance:** High balance of $56,740 from 10/2018 to 07/2019
**Remarks:** CLOSED

| | 07/2019 | 06/2019 | 05/2019 | 04/2019 | 03/2019 | 02/2019 | 01/2019 | 12/2018 | 11/2018 | 10/2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance | $0 | $30,446 | $31,390 | $32,331 | $33,271 | $34,206 | $35,148 | $36,079 | $37,007 | $37,937 |
| Scheduled Payment | $0 | $1,017 | $1,017 | $1,017 | $1,017 | $1,017 | $1,017 | $1,017 | $1,017 | $1,017 |
| Amount Paid | $0 | $1,017 | $1,017 | $1,017 | $1,017 | $1,017 | $1,017 | $1,017 | $1,017 | $1,017 |
| Past Due | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Rating | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| | 09/2018 | 08/2018 | 07/2018 | 06/2018 | 05/2018 | 04/2018 | 03/2018 | 02/2018 | 01/2018 | 12/2017 |
|---|---|---|---|---|---|---|---|---|---|---|
| Rating | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| | 11/2017 | 10/2017 | 09/2017 | 08/2017 | 07/2017 | 06/2017 | 05/2017 | 04/2017 | 03/2017 | 02/2017 |
|---|---|---|---|---|---|---|---|---|---|---|
| Rating | OK | OK | OK | OK | OK | OK | OK | OK | OK | 30 |

| | 01/2017 | 12/2016 | 11/2016 |
|---|---|---|---|
| Rating | OK | OK | OK |

## Satisfactory Accounts

The following accounts are reported with no adverse information. For your protection, your account numbers have been partially masked, and in some cases scrambled. Please note: Accounts are reported as "Current; Paid or paying as agreed" if paid within 30 days of the due date. Accounts reported as Current may still incur late fees or interest charges if not paid on or before the due date.

**CITICARDS CBNA #** 42418132187***

5800 SOUTH CORPORATE
PLACE
SIOUX FALLS, SD 57108
(888) 248-4728

| | | | | | |
|---|---|---|---|---|---|
| **Date Opened:** | 12/27/2016 | **Balance:** | $0 | **Pay Status:** | Current Account |
| **Responsibility:** | Individual | **Date Updated:** | 05/04/2018 | **Terms:** | Paid Monthly |
| **Account Type:** | Revolving | **Last Payment** | 11/30/2017 | **Date** | 12/02/2017 |
| **Loan Type:** | SECURED | **High Balance:** | $510 | **Date Paid:** | 11/30/2017 |
| | CREDIT CARD | **Credit Limit:** | $500 | | |

**Remarks:** Account closed at consumer's request; CLOSED

| | 04/2018 | 03/2018 | 02/2018 | 01/2018 | 12/2017 | 11/2017 | 10/2017 | 09/2017 | 08/2017 | 07/2017 |
|---|---|---|---|---|---|---|---|---|---|---|
| Rating | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| | 06/2017 | 05/2017 | 04/2017 | 03/2017 | 02/2017 | 01/2017 |
|---|---|---|---|---|---|---|
| Rating | OK | OK | OK | OK | OK | OK |

**CITICARDS CBNA** 542418142728***

5800 SOUTH CORPORATE
PLACE
SIOUX FALLS, SD 57108
(888) 248-4728

| | | | | | |
|---|---|---|---|---|---|
| **Date Opened:** | 12/02/2017 | **Date Updated:** | 03/15/2021 | **Pay Status:** | Current Account |
| **Responsibility:** | Individual | **Last Payment** | 01/29/2021 | **Terms:** | $35 per month; paid |
| **Account Type:** | Revolving | **Made:** | | | Monthly |
| **Loan Type:** | CREDIT CARD | | | | |

**High Balance:** High balance of $3,140 from 10/2018 to 03/2021
**Credit Limit:** Credit limit of $3,200 from 10/2018 to 01/2019; $4,700 from 02/2019 to 03/2021

| | 03/2021 | 02/2021 | 01/2021 | 12/2020 | 11/2020 | 10/2020 | 09/2020 | 08/2020 | 07/2020 | 06/2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance | $85 | $0 | $85 | $0 | $0 | $85 | $0 | $0 | $0 | $0 |
| Scheduled Payment | $35 | | $35 | | | $35 | | | | |
| Past Due | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Rating | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| | 05/2020 | 04/2020 | 03/2020 | 02/2020 | 01/2020 | 12/2019 | 11/2019 | 10/2019 | 09/2019 | 08/2019 |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance | $0 | $85 | $0 | $0 | $0 | $78 | $608 | $0 | $108 | $0 |
| Scheduled Payment | | $35 | | | | $25 | $25 | | $25 | |
| Past Due | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Rating | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| | 07/2019 | 06/2019 | 05/2019 | 04/2019 | 03/2019 | 02/2019 | 01/2019 | 12/2018 | 11/2018 | 10/2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance | $875 | $0 | $874 | $0 | $0 | $923 | $0 | $0 | $141 | $0 |
| Scheduled Payment | $25 | | $25 | | | $25 | | | $25 | |
| Past Due | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Rating | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| | 09/2018 | 08/2018 | 07/2018 | 06/2018 | 05/2018 | 04/2018 | 03/2018 | 02/2018 | 01/2018 | 12/2017 |
|---|---|---|---|---|---|---|---|---|---|---|
| Rating | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

## JPMCB CARD SERVICES #▮▮▮▮▮▮▮▮▮▮

PO BOX 15369
WILMINGTON, DE 19850
(800) 945-2000

| | | | |
|---|---|---|---|
| **Date Opened:** | 07/20/2019 | **Date Updated:** | 03/19/2021 |
| **Responsibility:** | Individual | **Last Payment Made:** | 10/07/2020 |
| **Account Type:** | Revolving | | |
| **Loan Type:** | FLEXIBLE SPENDING CREDIT CARD | | |

**Pay Status:** Current Account
**Terms:** Paid Monthly
**Date Paid:** 10/07/2020

**High Balance:** High balance of $1,377 from 08/2019 to 09/2019; $1,435 from 10/2019 to 02/2020; $1,870 from 03/2020 to 07/2020; $6,005 from 08/2020 to 03/2021
**Credit Limit:** Credit limit of $5,700 from 08/2019 to 03/2021

| | 03/2021 | 02/2021 | 01/2021 | 12/2020 | 11/2020 | 10/2020 | 09/2020 | 08/2020 | 07/2020 | 06/2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance | $0 | $0 | $0 | $0 | $0 | $0 | $7 | $0 | $0 | $0 |
| Scheduled Payment | | | | | | | $7 | | | |
| Past Due | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Rating | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| | 05/2020 | 04/2020 | 03/2020 | 02/2020 | 01/2020 | 12/2019 | 11/2019 | 10/2019 | 09/2019 | 08/2019 |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance | $0 | $0 | $0 | $0 | $2 | $5 | $0 | $0 | $0 | $0 |
| Scheduled Payment | | | | | $2 | $5 | | | | |
| Past Due | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Rating | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

## STATE FARM BANK #▮▮▮▮▮▮▮▮▮▮

PO Box 2313
Bloomington, IL 61702
(877) 734-2265

| | | | |
|---|---|---|---|
| **Date Opened:** | 08/05/2019 | **Date Updated:** | 03/17/2021 |
| **Responsibility:** | Individual | **Payment Received:** | $27,378 |
| **Account Type:** | Installment Account | **Last Payment Made:** | 03/17/2021 |
| **Loan Type:** | AUTOMOBILE | | |

**Pay Status:** Current Account
**Terms:** $0 per month, paid Monthly for 60 months
**Date Closed:** 03/17/2021

**High Balance:** High balance of $37,691 from 08/2019 to 03/2021
**Remarks:** CLOSED

| | 03/2021 | 02/2021 | 01/2021 | 12/2020 | 11/2020 | 10/2020 | 09/2020 | 08/2020 | 07/2020 | 06/2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance | $0 | $27,300 | $27,909 | $28,507 | $29,102 | $29,699 | $30,290 | $30,883 | $31,470 | $32,055 |
| Scheduled Payment | $0 | $699 | $699 | $699 | $699 | $699 | $699 | $699 | $699 | $699 |
| Amount Paid | $27,378 | $699 | $699 | $699 | $699 | $699 | $699 | $699 | $699 | $699 |
| Past Due | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Rating | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| | 05/2020 | 04/2020 | 03/2020 | 02/2020 | 01/2020 | 12/2019 | 11/2019 | 10/2019 | 09/2019 | 08/2019 |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance | $32,641 | $33,222 | $33,804 | $34,380 | $34,963 | $35,535 | $36,105 | $36,677 | $37,242 | $37,810 |
| Scheduled Payment | $699 | $699 | $699 | $699 | $699 | $699 | $699 | $699 | $699 | $699 |
| Amount Paid | $699 | $699 | $699 | $699 | $599 | $699 | $699 | $699 | $699 | $0 |
| Past Due | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Rating | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

## Promotional Inquiries

The companies listed below received your name, address and other limited information about you so they could make a firm offer of credit or insurance. They did not receive your full credit report. These inquiries are not seen by anyone but you and do not affect your score.

**CAPITAL ONE BANK USA NA**

P O Box 31293

Salt Lake City, UT 84131
(800) 955-7070
**Requested On:** 08/05/2020, 06/03/2020

**JP MORGAN CHASE BANK**

301 N WALNUT STREET

WILMINGTON, DE 19801
(800) 432-3117
**Requested On:** 07/27/2020, 06/26/2020,
05/26/2020, 04/26/2020

**UNITED AUTOMOTIVE SERV**

770 SPIRIT OF ST LOUIS BLVD

CHESTERFIELD, MO 63005
(636) 733-3317
**Requested On:** 05/31/2020

## Account Review Inquiries

The listing of a company's inquiry in this section means that they obtained information from your credit file in connection with an account review or other business transaction with you. These inquiries are not seen by anyone but you and will not be used in scoring your credit file (except insurance companies may have access to other insurance company inquiries, certain collection companies may have access to other collection company inquiries, and users of a report for employment purposes may have access to other employment inquiries, where permitted by law).

**CITICARDS CBNA**

CITI BRANDS CREDIT BUREAU DISP
POB 6241
SIOUX FALLS, SD 57117
Phone number not available
**Requested On:** 02/28/2021

**LONG HUI LIN VIA TRANSUNION INTERACTIVE IN**

100 CROSS ST
STE 202
SAN LUIS OBISPO, CA 93401
(855) 681-3196
**Requested On:** 04/05/2021, 04/05/2021

**LONGHUI LIN VIA TRANSUNION INTERACTIVE IN**

100 CROSS ST
STE 202
SAN LUIS OBISPO, CA 93401
(855) 681-3196
**Requested On:** 11/17/2020

**LONGHUI LIN VIA KARMATRANSUNION INTERACT**

100 CROSS STREET
SAN LUIS OBISPO, CA 93401
(844) 580-6816
**Requested On:** 10/13/2020

**STATE FARM BANK**

PO Box 2313

Bloomington, IL 61702
(877) 734-2265
**Requested On:** 10/02/2020

**TU INTERACTIVE**

100 CROSS ST
202
SAN LUIS OBISPO, CA 93401
(844) 580-6816
**Requested On:** 04/05/2021, 11/17/2020

**FACTACT FREE DISCLOSURE**

P O BOX 1000
CHESTER, PA 19016
(800) 888-4213
**Requested On:** 11/17/2020

**LONGHUI LIN VIA TRANSUNION INTERACTIVE**

100 CROSS STREET 202
SAN LUIS OBISPO, CA 93401
(800) 493-2392
**Requested On:** 07/20/2020, 06/04/2020,
05/20/2020, 04/20/2020, 03/20/2020, 02/20/2020,
01/20/2020, 12/20/2019, 11/20/2019, 10/20/2019,
09/05/2019, 08/20/2019, 07/20/2019

**JPMCB CARD SERVICES**
PO BOX 15298
WILMINGTON, DE 19850
(800) 432-3117
**Requested On:** 06/04/2020
**JPMCB CONSUMER BANK**

PO BOX 15298
WILMINGTON, DE 19850
(800) 935-9935
**Requested On:** 08/06/2019, 07/20/2019

**514440638 VIA TRANSUNION INTERACTIVE**
100 CROSS STREET 202
SAN LUIS OBISPO, CA 93401
(800) 493-2392
**Requested On:** 09/02/2019

## Additional Information

The following disclosure of information might pertain to you. This additional information may include Special Messages, Office of Foreign Assets Control ("OFAC") Potential Name Matches, Inquiry Analysis, Military Lending Act ("MLA") Covered Borrower Information, and/or Third Party Supplemental Information. Authorized parties may also receive the additional information below from TransUnion.

## Special Messages

The following Special Messages may be provided to an authorized party when it makes an inquiry into your TransUnion credit report. These messages provide important details concerning the information contained in your file and/or the authorized party's inquiry.


INPUT SSN LIKELY NOT ISSUED PRIOR TO JUNE 2011

## SHOULD YOU WISH TO CONTACT TRANSUNION, YOU MAY DO SO,

**Online:**
To report an inaccuracy, please visit: dispute.transunion.com
For answers to general questions, please visit:
www.transunion.com

**By Mail:**
TransUnion Consumer Relations
P.O. Box 2000
Chester, PA 19016-2000

**By Phone:**
(800) 916-8800
You may contact us between the hours of 8:00 a.m. and 11:00 p.m. Eastern Time, Monday through Friday, except major holidays.

*For all correspondence, please have your TransUnion file number available (located at the top of this report).*

## Consumer Rights

Para informacion en espanol, visite www.consumerfinance.gov o escribe a la Consumer Financial Protection Bureau, 1700 G Street N.W. Washington, DC 20552.

### A Summary of Your Rights Under the Fair Credit Reporting Act

The federal Fair Credit Reporting Act (FCRA) promotes the accuracy, fairness, and privacy of information in the files of consumer reporting agencies. There are many types of consumer reporting agencies, including credit bureaus and specialty agencies (such as agencies that sell information about check writing histories, medical records, and rental history records). **For more information, including information about additional rights, go to** www.consumerfinance.gov/learnmore **or write to: Consumer Financial Protection Bureau, 1700 G Street N.W., Washington, DC 20552.**

- **You must be told if information in your file has been used against you.** Anyone who uses a credit report or another type of consumer report to deny your application for credit, insurance, or employment - or to take another adverse action against you - must tell you, and must give you the name, address, and phone number of the agency that provided the information.

- **You have the right to know what is in your file.** You may request and obtain all the information about you in the files of a consumer reporting agency (your 'file disclosure'). You will be required to provide proper identification, which may include your Social Security Number. In many cases, the disclosure will be free. You are entitled to a free disclosure if:
  - a person has taken adverse action against you because of information in your credit report;
  - you are the victim of identity theft and place a fraud alert on your file;
  - your file contains inaccurate information as a result of fraud;
  - you are on public assistance;

EXHIBIT 3(A-B)

TRANSLATED LETTER

Dear Honorable Justice:

I am Zi Liu Zhang, and Xiu Xiang Fang's boyfriend.  Xiu Xiang and I have been together for ten years. During this time, Long Hui would often participate in family gatherings; therefore, I  often had seen him. From my observations, he would contact Xiu Xiang weekly.  Long Hui and his mother are in excellent relations. Long Hui very much  loves and respects his mother.

What I see is that Long Hui has been a very kind and responsible son.  Xiu Xiang 's health, due to previous jobs, has not been well in the shoulders and back.  Long Hui would often come and visits us and help us in doing chores. Especially, during the pandemic, we have been afraid of getting infected by the virus, and stayed at home - not going out.  Most things have been done by Long Hui, who has helped us. It is hoped that Your Honor will give Long Hui a chance in reforming himself.


Zi Liu Zhang

亲爱的法官大人，

我是Zi Liu Zhang，是Xiu Xiang Feng 的男朋友。我和Xiu Xiang已经在一起10年了。在这段时间里，Long Hui经常会来参加家庭聚会，所以我经常会跟他见面。在我的观察中，每周都联系Xiu Xiang。Long Hui和他的妈妈感情很好，Long Hui非常爱和尊重他的妈妈。

在我眼中Long Hui是一个很善良和有责任心的孩子。Xiu Xiang的身体因为以前工作的原因肩膀和腰都不好，Long Hui经常会过来探望我们和帮忙我们做事。特别是在疫情期间，我们害怕被病毒传染，所以都在家里不出门，大部分事情都是Long Hui帮我们去完成的。希望法官大人给Long Hui一次改过自新的机会。

TRANSLATED LETTER

Dear Honorable Justice:

I am Xiu Xiang Fang.  I am Long Hui Lin's mother.  Due to when Long Hui was just over a year old, his father had come to the United States, he never had his father's company in his youth.  It was just he and I living together in China. For I needed to work to earn a living,  Long Hui would have to board in school from Mondays to Fridays, and came home on weekends. Since his youth, Long Hui had been very understanding. In school, his grades were excellent. His teachers always praised him during parents and teachers meetings. And at home, Long Hui would help in sharing my toils in household chores.

In 2009, to get Long Hui a complete family, I took Long Hui  and together we came to the United States, and tried to get back with Long Hui's father. However, during this time, Long Hui's father had learned to gamble, and had a lover.  He did not help us at all when we arrived in the United States.

At that time, Long Hui and I did not have a place to live.  At nights, we would sleep on chairs in a relative's restaurant. We lived under such conditions for about three to four months.  Since I did not know English, I could just find a job in Chinatown's restaurants. After I was working, I was able to find us a shared room rental on Market Street in Chinatown.  At last, Long Hui and I had some private spaces of our own.

Hong Hui was 14 years old in 2009.  He was suddenly put into a completely strange environment. There were no friends, or classmates; plus the language barrier.  But my work was from twelve o'clock at noon to two o'clock into the night. I had no way in being next to him, The school's teacher had told me that Long Hui had not been speaking for a few months in school. This condition would only improved when he met new friends.

While we were living in Chinatown, Long Hui's father would come and see Long Hui every now and then; however, each time, he and I would get into arguments. One night, when Long Hui's father was visiting, and was arguing with me, he hit me and caused my ear and hand to be swollen. This caused me to missed work for three days. When Long Hui returned home, and saw what had happened, he was very angry and wanted to find his father to reason with him. But I stopped him. The incident affected Long Hui a great deal, and subdued his enthusiasm in attending college. And during the midterm in Long Hui's 12th grade, I had been overworked and my health needed to have set medical care; he quit school and found work in order to reduce my burdens.

Long Hui has been my only moral support, in China or when we just arrived in the United States. No matter what the difficulty, I would continue to hold for him. If Longgie shall go to jail I will be stupefied, and very afraid. I fear that I would not be able to stand such pressures. My grandson is just one year old, and I am of ill health. Plus there is the pandemic, and job opportunities are less. My daughter in-law cannot and will no be able to work and care for their baby at the same time. Long Hui has promised me that he will not do anything wrong again. It is hoped that Your Honor will show mercy, and give Long Hui a chance. I will do my utmost to ensure that he will not hang out with those bad people, or do anything illegal.

亲爱的法官大人，

我是Xiu Xiang Fang，我是Long Hui Lin的妈妈。因为Long Hui 的爸爸在 他1岁多的时候就来到了美国，Long Hui从小身边就没有爸爸的陪伴，只能和我在中国相依为命，因为我要工作赚钱，Long Hui周一到周五会在寄宿学校，周末的时候回家。Long Hui从小就很懂事，在学校成绩很好，每次家长会老师都会向我称赞他。而在家的时候，Long Hui会一起帮忙做家务分担我的辛苦。

2009年的时候我为了给Long Hui一个完整的家庭，和long Hui一起来到美国尝试着跟Long Hui的爸爸复合。可是Long Hui的爸爸在美国这段时间里学会了赌钱和有了情人，我们到美国的时候没有帮助我们。

当时我和Long Hui 没有地方住，晚上只好睡在亲戚餐馆的餐厅椅子上，在这种情况下住了3到4个月。因为我不会英文，我只能在唐人街找一份餐馆的工作。在我在找到工作一段时间后，我在唐人街的market Street上分租了一个房间，Long Hui和我终于有了自己的私人空间。

2009年Long Hui当时14岁，他突然到了一个完全陌生的环境，没有朋友和同学，而且有语言上的障碍，而我的工作时间是由中午12点到晚上2点，我没办法在他的身边陪伴他。学校的老师跟我说Long Hui几个月在学校没讲话，这种情况在他交到新朋友才有所改善。

Long Hui的爸爸在我们住在唐人街的期间会不定时的过来看Long Hui，可是每次都会跟我有争吵。有一天晚上Long Hui 爸爸过来的时候，跟我发生了争执，还动手打我，把我的耳朵和手打肿了，让我3天没办法上班。Long Hui回家看到后非常气愤想找他爸爸理论，但是被我阻止了。我觉得这件事对Long Hui的影响很大，上学的热情也被打消了，在Long Hui读12年级中期，我的身体因为长时间工作原因要定时的看医生，他为了减轻我的负担而辍学出来工作。

Long Hui 是我一生的精神支柱，不管是在中国或者是刚到美国的那段时间，就算是遇到再多的困难，为了他我都会支持下去。如果小龙要去坐牢，我会很迷茫，很害怕，我怕我承受不了这样的压力。我的孙子现在才1岁，我的身体又不好，而且因为疫情的关系，工作的机会也减少了。我的媳妇没办法和没能力一边工作一边照顾宝宝。Long Hui已经跟我保证不会做错误的事情。希望法官大人可以挽开一面，给Long Hui一次机会，我会尽我的努力让他保证不会再跟那些坏人玩，而做出犯法的事。